ADMIRAL FINANCIAL CORPORATION,
Plaintiff,

v.

The UNITED STATES of
America, Defendant.

No. 93–489C.

United States Court of Federal Claims.

Oct. 16, 2002.

As Corrected Oct. 21, 2002.

Thomas J. Meeks, Miami, FL, with whom were Alan G. Greer, Miami, FL, and Lynn F. Kaufmann, Washington, D.C., for Plaintiff, Admiral Financial Corporation.

Arlene Pianko Groner, with whom were F. Jefferson Hughes, Jeanne E. Davidson, David M. Cohen, and David W. Ogden, Department of Justice, Washington, D.C., for Defendant.

## OPINION

BASKIR, Judge.

This case is among the *Winstar*-related cases arising out of the 1980's savings and loan crisis. The history behind the thrift industry's crisis and the measures taken by the Government to resolve it have been extensively discussed in numerous earlier cases. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar IV*), *aff'g,* 64 F.3d 1531 (Fed. Cir.1995) (*en banc*) (*Winstar III*). We will not recount that history here, except as it may apply to the facts of this case.

Pending before the Court are a series of cross-motions requesting summary judgment on the issue of liability. The Court finds in favor of the Plaintiff on the existence of a contract and its breach by the Government. We find unavailing the defenses offered by the Government in its initial and supplemental pleadings. However, we reserve ruling on one question affecting liability—that of

the Plaintiff's alleged prior breach. The Court will hear evidence on this theory as part of the trial on damages. Accordingly, the Plaintiff's "Short Form" Motion for Partial Summary Judgment on Liability is GRANTED in part, and DENIED in part. Similarly, Defendant's cross-motion for summary judgment on liability is DENIED.

### FACTS

### I. The *Winstar* Context

Old Haven Federal Savings & Loan Association (Old Haven) was one of many failing thrifts that the Federal Government sought to rescue during the savings and loan crisis. Plaintiff, Admiral Financial Corporation (Admiral), acquired Old Haven through its subsidiary, Admiral Federal Savings and Loan Association, which was created for the sole purpose of merging with the thrift. The merger was approved by the Government and was undertaken by Admiral with the benefit of a number of regulatory incentives, which we discuss in more detail shortly. The factual circumstances regarding contract formation are undisputed. The material disputes are legal questions: Whether the circumstances of this transaction resulted in the formation of a legally binding contract, and whether the Government breached that contract.

By 1987, when the parties first discussed the transaction in question, it was well known that the Federal Government had been offering both financial assistance and certain regulatory forbearances to banks willing to assume the liabilities associated with acquiring failing savings and loan institutions. These incentives were offered by the Federal Home Loan Bank Board (FHLBB or Bank Board), and its affiliated Federal Savings and Loan Insurance Corporation (FSLIC), overseeing financial institutions such as those involved here.

Collectively, the forbearances allowed the acquiring institution some leeway in meeting regulatory capital requirements. For instance, the Bank Board regularly allowed institutions entering into these merger agreements to account for the acquisition using the purchase method of accounting.

As a result, the bank acquiring the failing thrift could account for a certain level of "supervisory goodwill." In addition, the FHLBB would allow this supervisory goodwill to be amortized by the acquiring institution over an extended period using the straight-line method. This arrangement kept the bank from falling out of regulatory compliance due to the liabilities assumed with the merger.

### II. The Admiral—Old Haven Transaction

The merger transaction in this case followed the general pattern with one curious twist. Apparently, many of the issues were negotiated before, not after, the object of the merger was identified. From the very beginning, Admiral made clear that forbearances regarding regulatory goodwill were an essential element in any acquisition. This element was regularly restated as the transaction evolved. On May 6, 1987, in correspondence addressed to a supervisory agent with the Federal Home Loan Bank of Atlanta, Admiral's president, William Lee Popham, first put in writing the prospect of acquiring a failing thrift. The letter suggests that substantial discussions between these parties had preceded this more formal proposition. The stated purpose of the correspondence was "to more clearly define [Admiral's] sources of equity to be made available in order to purchase a Savings & Loan Association, the proposed method of acquisition, and the specific consents and forbearances that will be requested from the regulatory authorities in connection with the acquisition." Short Form, App. Ex. 2 at 1. Mr. Popham did not approach the Bank Board with a prospective thrift in mind. It was an official on the Bank Board who targeted Old Haven as a potential acquisition.

Whether they were addressed in previous discussions with the regulators, mimicked from prior transactions with other banks that had acquired savings and loan associations, or raised for the first time by Admiral, the forbearances sought in this introductory stage of "negotiations" were clearly laid out by Mr. Popham.

First, Admiral sought confirmation from the Bank Board that, for purposes of regula-

tory capital compliance, the balance of assets and liabilities of the merged institutions would be accounted for by very specific guidelines that other acquiring institutions had recently been afforded. Short Form, App. Ex. 2 at 7. Namely, the negative net worth of the newly formed thrift would result in the creation of "goodwill" that would be treated as an asset, not a liability. Also, Admiral would be entitled to account for the negative net worth of the thrift under the purchase method of accounting as opposed to pooling of interests respecting the thrift. Moreover, Admiral desired to amortize any resulting goodwill on a straight line basis over a 25–year period.

Collectively, these forbearances would revalue the balance sheet of assets and liabilities resulting from the merger so that the excess costs were treated as goodwill and did not reflect unfavorably on Admiral's capital. *See S. Cal. Fed. Sav. & Loan v. United States*, 52 Fed.Cl. 531, 536 (2002) (*SoCal*). In fact, without these forbearances, the new thrift would have suffered a fatal shortfall of capital in this particular case, and would have been out of compliance with regulatory capital requirements immediately after the merger. *See also Winstar III*, 64 F.3d at 1542 (discussing that the Glendale thrift would have also been in noncompliance on the first day after the merger).

Mr. Popham's letter addressed many other items, but as he indicated, they were included "merely for the purpose of clearing the air with respect to items that do not necessarily require regulatory approval." Short Form, App. at 7.

Soon after Old Haven was marked for acquisition, Admiral sent the thrift its Letter of Intent. The letter, dated July 20, 1987, conditioned its offer to acquire Old Haven on "understandings and agreements" with the Bank Board:

> In connection with the acquisition, Admiral intends to enter into certain *understandings and agreements* with representatives of the Federal Home Loan Bank of Atlanta, whereby certain actions, advance approvals, and/or forbearances may be requested by Admiral. This purchase is also *contingent upon Admiral's reasonable acceptance of such understandings and agreements as are ultimately negotiated.*

Short Form, App. Ex. 3 at 4 (emphasis added).

Admiral and Old Haven entered into a formal merger agreement on August 6, 1987, resulting in the formation of a new institution named Haven Federal Savings and Loan Association (Haven). By its terms, Admiral contributed $6.4 million net equity in real estate and cash in order to bring Old Haven into compliance with the FHLBB's minimum capital requirements. Apparently, however, the conditions upon which the deal was founded had not yet been met. *See* Short Form, Ex. 4, Agreement and Plan of Reorganization, para. 7 ("Conditions to the Obligations of Admiral"). The merger agreement was contingent upon "forbearances, conditions or limitations customarily imposed in supervisory acquisitions similar to the proposed transaction and reasonably satisfactory to Admiral." Short Form, Ex. 4, Agreement and Plan of Reorganization, para. 7(k).

On September 14, 1987, Admiral applied for approval of the merger utilizing Application H-(e)1, the FSLIC's standard form for acquisitions of this type. The application reiterated the forbearances detailed in Mr. Popham's initial proposition, described variously as "material provisions of the agreement" and "key essential elements ... for the restoration of Haven to a profitable operating status." Short Form, App. Ex. 5 at 6–7, 9, 17–18. Admiral also indicated that denial of the requested forbearances could result in the withdrawal of its application, "inasmuch as Admiral's economic intent in entering into the agreement with Haven will have been frustrated." Short Form, App. Ex. 5 at 7.

The FHLBB commenced with its review of Admiral's application and as a courtesy provided Admiral a copy of the Board's informal comments respecting the sufficiency of the application on December 23, 1987. Although issues were raised concerning certain items, such as the appraised values of contributed real estate, the FHLBB's regulatory oversight office apparently had no problems with the provisions concerning the regulatory ac-

counting treatment Admiral demanded of the Government. *See* Short Form, App. Ex. 6. Subsequently, on February 26, 1988, the Bank Board notified Admiral that its application had been deemed sufficient under the governing regulations. Short Form, App. Ex. 7.

The merger was formally approved April 26, 1988, with the issuance of FHLBB Resolution 88–305. This Resolution incorporated Admiral's business plan, which included a schedule for liquidating the contributed real estate assets, the bulk of Admiral's contributions. The Resolution also contemplated the FHLBB's utilization of the goodwill accounting treatment previously described and a corresponding capital maintenance commitment by Admiral. Short Form, App. Ex. 8. Although the approval document was silent with respect to the forbearances, the FHLBB specifically incorporated these items into Resolution 88–305 via a May 4, 1988 letter. Pertinent in this regard, the letter contains several provisions evidencing a record of correspondence leading up to the Bank Board's approval of the acquisition:

> For purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the purchase, may be amortized by Haven for a period not to exceed 25 years by the straight-line method.

Short Form, App. Ex. 9.

For Admiral's part, it committed to maintain the minimum capital level required by the Bank Board. Critical to its ability to do so, of course, was the favorable regulatory treatment bargained for by Admiral which, in this case, resulted in the recording of $8.98 million of goodwill on the books of the newly formed Haven.

The Government has raised as a defense that this document, executed by Admiral, shifted the risk of regulatory change to the Plaintiff; it appears to make Admiral's obligation subject to changes in regulatory requirements. *See* Regulatory Capital Maintenance/Dividend Agreement (RCMA) (June 15, 1988); Short Form, App. Ex. 10. The Government has regularly raised this argument in other *Winstar*-related cases. While

we can and do reconcile the RCMA promise and the goodwill promise, there remains the quite distinct promise by Admiral to maintain the capital level of the new thrift notwithstanding inclusion of goodwill capital. As we shall see, the failure to keep that promise constitutes one aspect of the Government's prior breach defense.

On June 16, 1988, the FHLBB notified the Plaintiff that it had reviewed the compliance items required for final approval of the transaction and had found them acceptable. Short Form, App. Ex. 11. These items included those affirmations and auditor reports typically required for approval of this type of transaction, as well as Admiral's commitment to meet the liquidation schedule for its contributed assets and maintain regulatory capital requirements.

In summary, when the merger was consummated, the documents generated between the Plaintiff and the Government in this case are similar to those found in the Brentwood and Family transactions that were reviewed in *California Federal Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*Cal Fed II*), *cert. denied*, 122 S.Ct. 920 (2002), and which have been submitted as joint exhibits in this case; that is, a Bank Board forbearance letter, a Bank Board resolution, and a Capital Maintenance Agreement.

### III.  Post–Merger Developments

Unlike the written record of the transaction resulting in the contract, occurrences subsequent to the merger are not so clear. Whether the Government's performance was excused by Admiral's own failure to perform its contractual obligations is subject to disputed facts, or so it appears at this stage of the proceedings. Our tentative understanding of these events—subject, of course, to proof at trial—is as follows:

When Haven sold a portion of its contributed real estate, the Westview properties, in March of 1989, the proceeds fell far short of the appraised value that had been previously accepted by the FHLBB in calculating the new institution's regulatory capital. In addition, there is a dispute as to whether this

property was even sold when Admiral said it was sold. In any event, Haven fell out of regulatory capital compliance by the end of the quarter, March 31, 1989. Throughout June and July, Haven unsuccessfully attempted to sell another portion of its contributed real estate, the U.S. Route 1 property appraised at $8.5 million. The Plaintiff has alluded to a number of improprieties on the Defendant's part which frustrated the sale of its real estate.

Under the terms of the RCMA, Admiral had 90 days in which to infuse enough additional capital to bring Haven into regulatory capital compliance. However, there is a dispute as to when this 90 days began to run and whether there are actually two 90–day periods. Apparently, a cure notice issued on April 28, 1989, was subsequently withdrawn and sent out a second time on July 17, 1989. On September 30, 1989, the next compliance period closed with Haven still out of regulatory compliance.

In the midst of Admiral's problems in capitalizing Haven, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA), on August 9, 1989. The resulting statutory scheme established strict new capital standards for savings and loan associations, abolished both the FHLBB and the FSLIC, transferring their authority to the newly created Office of Thrift Supervision (OTS), and altered a number of existing regulations under which the Admiral–Haven merger had occurred. At the end of 1989, the OTS issued the formal regulations putting into effect the Act's changes of capital requirements.

It is these new statutory and regulatory requirements, specifically new guidelines on the regulatory treatment of supervisory goodwill, that had the greatest impact upon the many plaintiffs involved in the *Winstar* litigation. Under FIRREA, Congress expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements. FIRREA established three new minimum capital standards: "tangible" capital, "core" capital, and "risk-based" capital. 12 U.S.C. § 1464(t). As a result of FIRREA, institutions such as Admiral could

no longer include goodwill in satisfying the new minimum *tangible* capital requirements. As a transitional dispensation, only a limited amount of goodwill could be counted towards the new minimum core capital requirements, and even this amount was to be phased out on December 31, 1994. Moreover, the statute limited the amortization period for goodwill to twenty years, not the 25 years that these parties had agreed upon. 12 U.S.C. § 1464(t)(9)(B).

Haven continued to experience losses in the quarter ending December 1989. It could not meet its minimum capital even with the now repealed practice of including supervisory goodwill in its calculation. Finally, on February 2, 1990, the OTS recommended conservatorship. The bank was seized in March of 1990 with a deficit in excess of $23 million.

## PROCEDURAL HISTORY

Admiral filed a five-count complaint in 1993 alleging both contract and takings claims. Admiral asserts that a contract had been formed between the United States and the Plaintiff arising out of the supervisory acquisition of Haven, and that the contract was breached by FIRREA and its accompanying regulations.

This case, along with most other *Winstar* cases, was stayed for several years to allow select test cases—*Winstar Corp., et al. v. United States* (90–8C), *Glendale Federal Bank, FSB v. United States* (90–772C), and *Statesman Savings Holding Corp., et al. v. United States* (90–773C)—to make their way through this Court, the Court of Appeals for the Federal Circuit and the Supreme Court. In each of these three cases, first the trial courts and then the appellate courts found that contracts existed and that the Government's enactment of FIRREA breached those contracts. *See Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract but requesting further briefing on contract issues) (*Winstar I*); 25 Cl.Ct. 541 (1992) (finding contract breached and entering summary judgment on liability) (*Winstar II*); *Statesman Sav. Holding Corp. and Glendale Fed. Bank v. United States*, 26 Cl.Ct. 904 (1992) (finding an ex-

press contract and granting summary judgment on liability to Statesman and Glendale) *(Statesman)*.

The cases were consolidated for appellate review. After an initial split panel decision in which the Federal Circuit reversed the Claims Court decisions, the Federal Circuit reconsidered the three cases *en banc* and affirmed. *See Winstar III,* 64 F.3d at 1531 (concurring with Judge Smith's holding in each case, finding that the parties formed an express contract and that the Government breached that contract when it enacted FIR-REA).

The Supreme Court in turn affirmed the Federal Circuit in a plurality opinion. *See Winstar IV,* 518 U.S. at 839, 116 S.Ct. 2432. In the wake of this decision, then-Chief Judge Loren Smith initially managed the 120 "*Winstar* cases" himself. More recently, the cases were distributed among the entire United States Court of Federal Claims. Since then, this Court and the Federal Circuit have issued numerous rulings on the basic aspects of liability and recurring defenses in the cases. *See Cal.Fed. II,* 245 F.3d at 1342, *aff'g, California Federal Bank, FSB v. United States; Landmark Land Co. v. United States; LaSalle Talman Bank, FSB v. United States; C. Robert Suess v. United States,* 39 Fed.Cl. 753, 754–55 (1997) (*Cal Fed I*) (finding an express contract was formed, and that FIRREA breached that contract, despite the absence of a *Winstar*-type Assistance Agreement with a specific integration clause). The Government has consistently attempted to distinguish each and every case presently before this Court, usually without success.

Despite clear appellate guidance on contract formation, the Defendant has argued here that factual differences warrant further litigation of the issue on a case-by-case basis. Furthermore, the Government argued that it was not re-litigating issues already determined because in this case it had raised a novel issue regarding the FHLBB's authority to guarantee thrifts against loss. *See* Def. Resp. to Show Cause Order at 2.

The Federal Deposit Insurance Corporation (FDIC) intervened in this case on October 21, 1996. We have since dismissed the claims of the FDIC and have entered judgment in favor of the Defendant as to those claims, on the basis that the FDIC lacked standing and that the FDIC's claims were barred by the statute of limitations. *Admiral Fin. Corp. v. United States,* 51 Fed.Cl. 366 (2002).

Pending before the Court is the Plaintiffs' "Short Form" Motion for Partial Summary Judgment and the Defendant's Cross–Motion for Partial Summary Judgment, both filed in 1997.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Cincom Systems, Inc. v. United States,* 37 Fed.Cl. 663, 670 (1997). In its consideration of motions for summary judgment, the Court resolves all reasonable inferences in the light most favorable to the non-moving party. RCFC 56(c). Where, as here, both parties have moved for summary judgment, it is incumbent upon the Court to evaluate each motion on its own merits. *See Kanehl v. United States,* 38 Fed.Cl. 89, 98 (1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

First, we must determine whether the documents we have cited constitute a contract between the Government and the Plaintiff. More particularly, we must decide whether the transactional documents described above formed a binding contract with the Plaintiff concerning Admiral's ability to count the supervisory goodwill generated from the merger towards the thrift's regulatory capital requirements. In this regard, Defendant has argued that the essential elements of a contract are absent: Plaintiff cannot demonstrate mutuality of intent to contract; Plaintiff assumed the risk of a change in regulatory policy; and the Bank Board lacked the authority to enter into a contract with Admiral. These are, as we have noted, familiar arguments offered and advocated almost by rote, and regularly rejected not only by other trial judges, but also by the reviewing courts.

The Government also points to circumstances that are special to this case. The Defendant asserts that any performance due was excused by Admiral's prior breach in failing to abide by the RCMA and other contractual promises. In a related argument, the Government claims that FIRREA did not harm Admiral because Admiral failed to meet capitalization requirements even with the inclusion of supervisory goodwill in its regulatory capital. As we will describe below, there is a substantial question as to whether the "prior breach" defense is properly before us at this time. Moreover, the legal papers are sparse and the facts are undeveloped.

## I. Contract Formation

At the heart of this case is whether the forbearances which Admiral received from the FHLBB were merely regulatory in nature, or had the force of a contractual promise. For the answer to this question, we look to the now well-trod path forged by the *Winstar* precedents, and the rapidly accumulating analyses and conclusions of our colleagues who have followed that path.

### A. *Mutuality of Intent*

■ The principal theory relied upon by the Government in each of the *Winstar*-related cases that has come before this Court is that the regulatory treatment of supervisory goodwill discussed above was merely a matter of then-prevailing regulatory policy, not a bargained for element of a contractual promise. However, this theory has been consistently rejected. The Supreme Court, the Federal Circuit and this Court have regularly, if not invariably, recognized that the counting of supervisory goodwill toward regulatory capital requirements is a binding promise supported by consideration. *See, e.g., SoCal*, 52 Fed.Cl. at 544–45.

The transaction at issue here is similar in most respects to transactions that were presented in the *Cal Fed* decision. *See Cal.Fed. I*, 39 Fed.Cl. at 753. As in all of these cases, *Cal.Fed* involved the acquisition of insolvent savings and loan institutions under the supervision of the FSLIC. As a part of the deal, the FSLIC permitted those institutions

to account for the acquisition using the purchase method of accounting, which created substantial amount of supervisory goodwill. *Id.* The banks were also permitted to amortize the resulting goodwill via a straight-line model over an extended period of time, in some cases over 35 years and in other cases over 40.

Unlike the transactions taken up in *Winstar, Glendale*, and *Statesman*, however, two of the three mergers (Brentwood and Family) in the *Cal.Fed* case were "unassisted." It is that transaction for which *Cal.Fed* is noteworthy. The Government provided the acquiring institution no direct financial assistance or capital credits as inducement to save the failing thrift. As a result, there was less documentation than that relied upon by the Supreme Court's *Winstar* decision from which to find a contract. For instance, unlike the transactions reviewed in the early test cases, these promises were not memorialized in an Assistance Agreement. Nor did the transaction include an integration clause neatly tying in all the parties, negotiations and documents into an over-arching agreement. The transaction, however, did include a RCMA, a FHLBB Resolution approving the merger, and a forbearance letter issued by the regulators. On appeal, the Federal Circuit found that these documents and the circumstances surrounding their creation were sufficient to find that the parties entered into a contract allowing the amortization of supervisory goodwill. *Cal Fed. II*, 245 F.3d at 1347–48.

In response to the Show Cause Order evolving out of Judge Smith's decision in *Cal Fed. I*, 39 Fed.Cl. at 779, and in reaction to the Federal Circuit's affirmance of this Court's finding of an express contract and breach, Defendant's mantra has been: *Cal Fed.* merely confirmed that a contract depends upon the factual circumstances of the individual transactions. While this is true, we would expect the Government to take the further step of demonstrating why this Haven case mandates a result different than that reached in *Cal Fed. See, e.g., Sterling Sav. v. United States*, 53 Fed.Cl. 599 (2002) ("To the extent that Defendant has not distinguished the promises made in the transac-

tions at issue ... from those promises that were upheld as contracts in *Cal Fed.*, the Court must find that Defendant undertook contractual obligations towards Plaintiff in these transactions.") Instead of dissecting the core documents in each transaction for meaningful distinctions, during oral argument the Government continued to rely only upon the general contract principles and arguments that it urged at the onset of all *Winstar* litigation, at least with respect to the existence of a contract.

Upon request, the Government provided the Court with an Appendix containing the documents from the *Cal Fed.* transactions including the unassisted merger. We have closely examined the documents underlying that transaction in particular, and we have attempted to compare them to the documents set forth in the pleadings of this case.

This procedure has its shortcomings, certainly. It is not possible in every instance to determine what weight Judge Smith or, on appeal, the Federal Circuit, afforded each provision within the *Cal Fed.* documents. Moreover, those mergers occurred several years prior to Admiral's acquisition of Haven—thus the Bank Board will have used slightly different approaches and reflected its promises in slightly different language as it ironed out kinks in the savings and loan bailout scheme. Notwithstanding these minor detriments, we are able to compare the two transactions. Having done so, we find that the relevant provisions from the *Cal Fed.* merger documents, compared to the equivalent provisions in the Admiral–Old Haven transaction, are not materially different from each other in any respect. The Government has not pointed to either fact or theory that dictates a different interpretation of the same texts.

In recent submissions and during oral argument, the Government has argued that the Plaintiff must demonstrate that it engaged in substantial negotiations regarding the regulatory treatment of goodwill, and that the FSLIC initiated these negotiations. In support of this theory, it relies upon the rationale of prior decisions of the Federal Circuit:

> If the parties did not intend to use supervisory goodwill for regulatory capital pur-

poses there would simply be no reason for the extensive negotiations and the conditions regarding its use.

*Winstar III,* 64 F.3d at 1542; *see also Cal Fed. II,* 245 F.3d at 1347 ("Here, as in *Winstar [IV]*, the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years.")

The Federal Circuit certainly was not establishing "negotiations" as a litmus test. It merely observed that extensive negotiations prompted by the Government was consistent with an intent by each party to be contractually bound regarding the regulatory forbearances. The history of negotiations may sometimes be looked at to determine contractual intent. But in the end it is only a guidepost. And here, where the agreements arise out of a comprehensive industry-wide effort to save the thrifts, the extent of active give-and-take negotiations is no more than a moving target: once it is well-known within the industry that certain regulatory forbearances are being offered, active negotiations will necessarily taper off, as what was once innovative and controversial becomes business as usual. Mr. Popham's "me too" correspondence makes it clear he wanted those same arrangements.

In this context, we also note that there were extensive give-and-take negotiations on other aspects of the transaction, and that the subject of the proposed merger was first identified by the FSLIC. We are also mindful of the concluding words of one document comprising the overall contract, the RCMA. The Miscellaneous Provisions, Section VI, repeatedly refer to the document as a "binding obligation."

The correspondence precipitating this transaction and the inclusion of the requested forbearances in regulatory documents leave little room for doubt as to Admiral's intent and its expectations regarding the specified treatment of goodwill. The details of this transaction were not merely an exercise of the FHLBB's regulatory powers—the

merger was conditioned on terms "reasonably satisfactory to Admiral." This is the language of a party to a contract, not an entity routinely submitting to a regulatory entity. The ability to include supervisory goodwill under the agreed upon terms was the key to Admiral's bargain. Without it there is no consideration supporting Admiral's promise to take on the failing thrift. This is made plain by the fact that without the forbearances Admiral would have fallen out of regulatory capital compliance upon the date of the merger. *See also Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432 (noting that the Glendale thrift also would have been out of compliance).

We find, therefore, that *Cal Fed.* controls. The documents—including the correspondence between Admiral and the Bank Board, the correspondence between Admiral and Old Haven, the applications for regulatory approval of the acquisition, the merger agreement, the FHLBB Resolution approving the merger, the RCMA executed between Admiral and the FHLBB, and the forbearance letter issued by the FHLBB—all support the Plaintiff's position that the parties intended to and did enter into a contractual agreement with respect to Admiral's capital contributions to allow push-down/purchase method accounting, to amortize supervisory goodwill over 25 years, and to allow that goodwill to be counted toward regulatory capital compliance.

### B. *Assumption of Regulatory Risk*

■ The Government asserts that the Plaintiff explicitly bore the risk of changes in the regulatory scheme. For this argument the Defendant points to various provisions of the RCMA found in the "Definitions" and "Miscellaneous Provisions" sections of the RCMA (emphasis supplied):

Sec. I (D). "Regulatory Capital" means regulatory capital defined in accordance with 12 CFR 561.13 or *any successor regulation thereto.*

Sec. I (E). "Regulatory Capital Requirement" means the Institution's regulatory capital requirement at a given time computed in accordance with 12 CFR 563.13 or *any successor regulation thereto.*

Sec. VI (D). All references to regulations of the Board or the FSLIC used in this Agreement shall include *any successor regulation thereto,* it being expressly understood that *subsequent amendments* to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this agreement.

Government made the same risk-shifting argument with respect to equivalent, but much more extensive text in Section 1 of the RCMA in *SoCal. See SoCal,* 52 Fed.Cl. at 545–46. In fact, the argument had been previously considered and rejected by then-Chief Judge Smith. *See Cal Fed I,* 39 Fed. Cl. at 779. It continues to resurface.

Given our understanding that the regulatory forbearances affecting supervisory goodwill were bargained for exchanges, we cannot accept the argument that Admiral also bargained away any ability to enforce these promises. Such a reading of the RCMA would result in no promise at all. *See* 1 SAMUEL WILLISTON, CONTRACTS § 43 at 140 (3d ed. 1957) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory.") In fact, Justice Scalia has described the Government's view of the allegedly risk-shifting provisions as no more than a "promise to regulate in this fashion for as long as [the Government] choose[s] to regulate in this fashion." *Cal Fed I* at 776–78 (citing *Winstar IV,* 518 U.S. at 921, 116 S.Ct. 2432 (Scalia, J., concurring)). He did not find it convincing, and neither do we.

When faced with a seemingly empty promise such as this we have two courses of action: (1) We may characterize the promise as an "illusory" one and find that it is not consideration for the other promise and, therefore, not enforceable against either party; or (2) We may read substance into the facially void promise, and hold that it is enforceable against both parties. *See* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 2.13 at 127 (2d ed.1998).

We choose the latter view, and thereby reconcile the apparently conflicting provisions of the documents. The "successor regulation" language within the RCMA simply requires Admiral to abide by changes in "capital requirements." This does not necessarily have the broad effect that the Defendant suggests. We read the provision as anticipating potential changes in the *level* of capital that thrifts must maintain—"increase or decrease" the obligation to maintain capital—or perhaps some other aspect of regulatory compliance. The provision should not be interpreted as exposing Admiral to the risk of sweeping changes in the bargained for *method* by which capital is accounted for by the FHLBB.

Our interpretation is supported by language in the Forbearance Letter. After specifically setting out the forbearances bargained for by Admiral (amortization of goodwill over 25 years, push-down accounting, and contributions counted toward regulatory capital at fair market value), the Bank Board indicates: "[t]he forbearances or waivers extended by this letter do not relieve Haven of its continuing obligations ... in accordance with applicable regulatory requirements .... This letter does not ... constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements *other than those encompassed within the preceding paragraphs.*" (emphasis added).

To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. *See, e.g., Guaranty Fin. Services, Inc. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir.1991) (finding that the Government had expressly reserved the right to change capital requirements without any responsibility to the acquiring thrift). However, the weight of recent precedent persuades us that the purported risk-shifting provisions do not avoid liability on the part of the Government. We dealt extensively with those precedents in recent decisions of this Court; the reasoning of those decisions are equally applicable here. *See SoCal,* 52 Fed.Cl. at 545–47; *Sterling,* 53 Fed.Cl. 599.

Of particular note is our earlier discussion of the "madness argument." In its *Winstar* trilogy opinion, the Supreme Court observed that the financial situation of the new, merged thrift resulting from the transaction in the *Glendale* case was such that absent the goodwill, it would have failed and been subject to penalties "from the moment of its creation." *Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432. So, too, in Admiral's case; the supervisory goodwill was needed from *day one* as an initial remedial component just to bring the thrift into compliance with the capital requirements. The Principal Opinion in *Winstar IV* is completely at odds with the idea that a party would assume the risk of regulatory changes under those circumstances:

> [I]t would have been irrational in this case for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment. This conclusion is obvious from both the dollar amounts at stake and the regulators' proven propensity to make changes in the relevant requirements.... Under the circumstances, we have no doubt that the parties intended to settle regulatory treatment of these transactions as a condition of their agreement.

*Id.* at 863–64, 116 S.Ct. 2432 (citations omitted).

Justice Souter concluded his opinion by noting:

> *It would, indeed, have been madness for respondents* [Winstar, Glendale, Statesman] to have engaged in these transactions with no more protection that the Government's reading would have given them, for the very existence of their institutions would have been in jeopardy from the moment their agreements were signed.

*Id.* at 910, 116 S.Ct. 2432 (emphasis added). That argument applies with equal force to this case. Haven would have failed immediately without the inclusion of the supervisory goodwill. It would have been immediately out of regulatory capital compliance the day after the merger were the regulatory forbearances stripped away. This undisputed fact supports the conclusion that the parties

clearly intended to contract for that particular promise.

### C. *Authority*

██ The Government has posed a third obstacle to contract formation: It challenges the authority of the FSLIC, through its supervisory agency, the FHLBB, to enter into a contract such as this. The *Winstar* precedents confirm that the FHLBB did have authority to enter into this type of contract:

> There is no question, conversely, that the Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do, that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible. The organic statute creating FSLIC as an arm of the Bank Board, 12 U.S.C. § 1725(c) (1988 ed.) (repealed 1989), generally empowered it "[t]o make contracts," and § 1729(f)(2), enacted in 1978, delegated more specific powers in the context of supervisory mergers.

*Winstar IV,* 518 U.S. at 890, 116 S.Ct. 2432 (citations omitted); *see also Cal. Fed. II,* 245 F.3d at 1347.

Strictly speaking, the statutory provisions relied upon by these decisions do not automatically control here. Those provisions govern the FHLBB's transactions with FSLIC-insured institutions. Admiral was a holding company and was not insured by the FSLIC. Its acquisition of Old Haven was approved by the FHLBB under 12 U.S.C. § 1730a (e)(1988), pertaining to the regulation of holding companies.

At the heart of the Government's argument is its insistence that this provision is entirely different than the "loss guarantee" provisions cited by the Supreme Court in *Winstar.* This case, as in all *Winstar* cases, involves the Bank Board's ability to provide assistance, direct or indirect, to failing thrifts. The statutory authority to guarantee against loss, which admittedly is found only in those provisions involving insured institutions, are not implicated here. Admiral's transaction did require the Government to provide financial assistance. The Government provided financial assistance in the form of incentives respecting the regulatory treatment of goodwill. The Supreme Court has held that the Government has the authority to offer such assistance in its regulation of the thrift industry. *See Winstar IV,* 518 U.S. at 890, 116 S.Ct. 2432. The fact that the instrument of this assistance happens to be a holding company that was not covered by deposit insurance is a distinction without a difference.

This Court has recognized the inapplicability of 12 U.S.C. § 1729 to institutions that are not covered by deposit insurance. *See Home Sav. of America v. United States,* 50 Fed.Cl. 427, 441–42 (2001). That case arises in the entirely different context of the acquisition of state-insured thrifts, which the Federal agency had no statutory obligation to support. The present dispute falls squarely in the *Winstar* context. Although Admiral was not insured by the FSLIC, Old Haven, the target of the acquisition was. Section 1729(f)(3), one of the provisions relied upon by the plurality in *Winstar,* authorized the provision of financial assistance to "any person acquiring control of . . . an insured institution." Moreover, the Bank Board's Resolution approving Admiral's acquisition of Haven states: "Admiral Federal has submitted an agreement to maintain membership in the Federal Home Loan Bank System as long as its accounts are insured by FSLIC." FHLBB Res. No. 88–305 (Apr. 26, 1988) at para. 36; *see also* para. 37. The Government insured the deposits of Old Haven and insured those same deposits held by Haven after the merger. *See* Res., Def.App. at 116, 122; RCMA, Def. App. at 301. Under the circumstances, we conclude the Bank Board was acting within its authority in entering into this agreement with Admiral.

## II. Defendant's Breach of Contract

██ Having found that the parties entered into a contract, we address the question of breach. The contractual language reciting the use of the purchase method of accounting and its 25–year amortization period constitutes a binding promise. It is now beyond

cavil that in enacting FIRREA, the Government broke that promise; the cases referred to throughout this Opinion have consistently held that FIRREA and its regulations breached a contractual obligation to accord acquiring institutions the various regulatory forbearances for which they bargained. *See, e.g., Winstar IV*, 518 U.S. at 866, 116 S.Ct. 2432; *Cal Fed. II*, 245 F.3d at 1348; and *SoCal*, 52 Fed.Cl. at 549. We thus conclude that the enactment also breached the Government's contract with Admiral.

### III. Plaintiff's Breach of Contract

The Defendant asserts that the Government's performance was excused by Admiral's own failure to abide by the contract's terms. The consideration supporting the Government's promises was the prospective savings in liquidation costs and the avoidance of a collapse of the savings and loan institution. The forbearances were offered by the Government in exchange for the rescue of the thrift. For that reason, the Bank Board approved the acquisition with the requirement that "the applicants shall enter into an Agreement with the Corporation stating that, as long as they control Haven, they will maintain the regulatory capital of Haven at a level equal to that required by 12 C.F.R. § 563.13(b) . . . and, as necessary, will infuse sufficient additional equity capital, in a form satisfactory to the Principal Supervisory Agent. . . ." *See* FHLBB Res. No. 88–305 at para. 6. The requirement was echoed in the RCMA. The Government contends that any contract formed was breached in three ways: By the employment of Mr. David Popham; by permitting Haven's capital to fall below regulatory requirements; and by failing to liquidate the contributed real estate in a timely manner.

The facts surrounding these alleged breaches are murky, at best, and clearly not undisputed. Moreover, the procedural status of the three prior breaches is legally uncertain. Resolution of these issues is further complicated by unsatisfactory briefing and the procedural posture of this defense. The "prior breach" defense was first raised by the Government in its motion to dismiss then-Intervenor FDIC. It was not raised by the Government in its cross-motion for summary judgment against the Plaintiff. In a supplemental brief in support of its motion for summary judgment the Government did touch on the issue of Admiral's failure to capitalize Haven. However, this brief was intended to introduce the Government's assumption of risk argument associated with the provisions of the RCMA—the Government did not assert the defense of prior breach excusing performance. Moreover, even as against the FDIC, the Government treated the prior breach theory in a cursory fashion. It did not, for example, explore the text of the RCMA.

In any event, the prior breach argument raised in the summary judgment motion against the FDIC mentioned only the first two of the three alleged breaches. The third, the failure to sell the real estate, was first presented in the oral argument of January 10, 2002, on Summary Judgment Cross Motions as respects Admiral, not FDIC. It has never been briefed. Finally, to complicate matters still further, the Government included the prior breach affirmative defense in its formal Answer, which was not filed until November 30, 2001.

For all these reasons, we decline to address the prior breach defense in the context of summary judgment motions. If the Government wishes to pursue it, it must present evidence at trial. The procedural and legal questions on this matter we will leave until post-trial briefing.

### CONCLUSION

A valid, binding contract existed between the Government through the FSLIC and Admiral. As other Courts have held, the Government breached that contract when it enacted FIRREA. **Accordingly, the Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. The Defendant's cross-motion for summary judgment is DENIED.**

**IT IS SO ORDERED.**