ADMIRAL FINANCIAL
CORPORATION, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 03–5168.

United States Court of Appeals,
Federal Circuit.

Aug. 5, 2004.

Thomas Meeks, Zuckerman, Spaeder, LLP, of Miami, FL, argued for plaintiff-appellant. Of counsel on the brief was Alan G. Greer, Richard Greer Weil Brumbaugh, Mirabito & Christensen, P.A., of Miami, FL, Of counsel was Lynn F. Kaufmann, Zuckerman, Spaeder, LLP, of Washington, DC.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Kenneth M. Dintzer, Senior Trial Counsel; and Arlene Pianko Groner and Daniel D. McClain, Trial Attorneys.

Before MAYER, Chief Judge, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This is a *Winstar*-related breach of contract case. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The Court of Federal Claims held that prior to any breach by the government, appellant Admiral Financial Corporation anticipatorily breached the contract. The Court of Federal Claims further held that, even if Admiral did not anticipatorily breach the contract, Admiral could not recover because it was not harmed by the government's breach. For the reasons set forth below, we affirm.

I

Two prior Court of Federal Claims decisions in this case set forth the facts in detail. *See Admiral Fin. Corp. v. United States,* 54 Fed.Cl. 247 (2002); *Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418 (2003). We include here only those facts necessary for our decision.

In February 1987, William Lee Popham contacted the Federal Home Loan Bank Board ("Bank Board") to discuss acquiring a failing savings and loan institution, or "thrift." In exchange for acquiring ownership, Mr. Popham offered to contribute assets to the thrift, including real estate, equity in a tax sale certificate business, marketable securities, and cash. The Bank Board suggested Haven Federal Savings & Loan as a candidate for acquisition. In April 1987, Mr. Popham formed Admiral Financial Corp. for the purpose of acquiring Haven. In August 1987, Admiral and Haven entered into an acquisition agreement under which Admiral agreed to contribute $6.4 million in real estate and

cash in order to bring Haven into compliance with the Bank Board's minimum capital requirements. The agreement was conditioned on the Bank Board's giving Admiral certain forbearances in connection with the regulatory oversight of Haven.

In September 1987, Admiral applied for Bank Board approval of its merger with Haven. After several iterations, the Bank Board deemed the application complete in February of 1988. The Bank Board issued a resolution in April 1988 formally approving the merger. The resolution incorporated a business plan under which Admiral agreed to liquidate the contributed real estate according to a schedule. The resolution also contemplated that the Bank Board would treat Haven's negative net worth as "goodwill," an asset, rather than as a liability. Haven initially recorded nearly $9 million of goodwill based on its negative net worth. In May 1988, additional terms were incorporated by letter into the resolution, including the Bank Board's agreement to allow the goodwill to be amortized over a period of 25 years using the straight-line method of depreciation.

In June 1988, the Bank Board and Admiral executed a Regulatory Capital Maintenance/Dividend Agreement ("RCMA"). The RCMA bound Admiral to maintain a certain level of capital in Haven, and it obligated Admiral to make up any capital shortfall. The agreement provided that if Haven's capital fell below the level specified in the RCMA, Admiral would have 90 days to infuse enough capital into Haven to make up the shortfall. If Admiral failed to make up the shortfall, it would be in default.

Things did not go well for Haven after its acquisition by Admiral. In March 1989, Haven sold a portion of the contributed real estate at substantially below the appraised value that had been accepted by the Bank Board. In addition, the equity interest in a business that Admiral had contributed to Haven and had valued at $4.1 million turned out to be valueless. By the end of March 1989, Haven was out of regulatory capital compliance by approximately $580,000. Pursuant to the RCMA, Admiral was obligated within 90 days to infuse enough capital into Haven to make up the shortfall. Admiral did not do so. Instead, Haven's financial condition further deteriorated, resulting in a shortfall of approximately $2.3 million by June 1989. On July 17, 1989, the Bank Board provided Admiral with an official notice of default.

According to the RCMA, Admiral was entitled to 90 days from the date of the default notice to cure the default. On August 2, 1989, the Bank Board removed Mr. Popham from his role as Haven's executive vice president and chief financial officer, but allowed him to remain a member of the Haven board of directors at no compensation. On August 9, 1989, nearly a month into the 90-day cure period, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), which limited Admiral's ability to count Haven's goodwill as an asset and to amortize it over a lengthy time period. FIRREA, however, did not take effect until December 7, 1989, and as of September 30, 1989, Haven was more than $4 million out of compliance under the pre-FIRREA accounting methods.

In March 1990, the Office of Thrift Supervision ("OTS"), the Bank Board's successor under FIRREA, placed Haven in receivership. At that time, Haven was more than $22 million out of regulatory capital compliance under FIRREA. It was approximately $12 million out of compliance under pre-FIRREA accounting methods.

In 1993, Admiral filed suit against the government, alleging, *inter alia*, that the

enactment of FIRREA resulted in a breach by the government of its contract with Admiral. The Court of Federal Claims agreed, ruling on summary judgment that Admiral and the Bank Board had an enforceable contract that the government had breached when it enacted FIRREA. *Admiral Fin. Corp. v. United States,* 54 Fed.Cl. 247 (2002) ("*Admiral I* "). After a trial, however, the Court of Federal Claims held that Admiral had anticipatorily breached the contract before the enactment of FIRREA, and hence the government was not liable for damages. *Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418 (2003) ("*Admiral III* "). In particular, the trial court concluded that "Mr. Popham's repeated disavowals of any intention to infuse capital constituted the effective rejection of any intention to honor the RCMA before the notice and cure time expired," and that Admiral "did not have the capacity, irrespective of FIRREA, to revive its investment in Haven." *Id.* at 433. According to the trial court, Admiral thus repudiated the contract prior to the enactment of FIRREA. *Id.* The government accepted that repudiation, the trial court concluded, when the Bank Board removed Mr. Popham from Haven and took "other measures [that] effectively stripped Admiral of control over the management of the assets it invested in the thrift." *Id.*

The court held that even if Admiral did not anticipatorily breach the contract, Admiral could not recover damages for the government's breach because FIRREA did not cause it any injury. 57 Fed.Cl. at 434–35. The court found that "the plethora of evidence [showed] that the thrift was in such dire straits that it was failing under pre-FIRREA capital requirements. The failed capitalization plan, overvalued real estate holdings, and lack of a financial commitment by the initial investors contributed to the thrift's decline and led ultimately—and independent of the superviso-

ry forbearance—to its seizure." *Id.* at 435.

## II

The government argues that by the terms of its contract Admiral assumed the risk of the regulatory changes brought about by FIRREA and that the enactment of FIRREA therefore did not breach the government's contractual obligations. The government did not prevail on that argument in the trial court, but it advances the argument here as an alternative ground for affirmance.

In a section entitled "Miscellaneous Provisions," the RCMA included clause VI(D), which provided as follows:

All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this Agreement.

On its face, clause VI(D) contemplated that the government might alter the regulations governing the supervision of thrifts such as Haven; by agreeing to the clause, Admiral acknowledged that its obligations might change if the regulatory regime changed.

In *Guaranty Financial Services, Inc. v. Ryan,* 928 F.2d 994, 999 (11th Cir.1991), the Eleventh Circuit found that an identical clause in the RCMA at issue in that case shifted to the acquirer the risk of a regulatory change of the kind effected by FIRREA and the regulations promulgated pursuant to FIRREA. The court explained that the clause "unmistakably warn[ed] Guaranty that its obligations under the contract may be increased by subsequent regulation." *Id.* The court held that "the agencies, at the same time they

made that promise [of regulatory forbearances], also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment," and that "[b]y signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not." *Id.* The court's analysis in *Guaranty,* if applied in this case, would lead to the conclusion that Admiral assumed the risk of a regulatory change such as the one brought about by FIRREA, and that the enactment of FIRREA and the promulgation of regulations pursuant to that statute did not constitute a breach of the government's contractual obligations.

■ Admiral asserts that *Guaranty* is not binding on this court. While that is true, we accord great weight to the decisions of our sister circuits when the same or similar issues come before us, and we "do not create conflicts among the circuits without strong cause." *Wash. Energy Co. v. United States,* 94 F.3d 1557, 1561 (Fed. Cir.1996).

Although recognizing that *Guaranty* is contrary to its position in this case, Admiral contends that this court's decision in *Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002), "disposed of any precedential force that *Guaranty Financial* may ever have had in this Circuit concerning such a contract clause." According to Admiral, *Castle* construed language similar to the language in clause VI(D) in Admiral's contract as not shifting the risk of regulatory change to the acquirer.

We do not agree with Admiral's reading of our decision in *Castle.* The court in *Castle* addressed a takings claim made by a party that acquired a thrift with a promise of regulatory forbearances similar to those at issue in this case. 301 F.3d at 1341–42. The acquirer alleged that the enactment of FIRREA constituted a taking of its contract with the government.

*Id.* at 1341. The court in *Castle* disagreed and ruled that "[t]he breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein." *Id.* at 1342. To support the conclusion that regulatory changes were common in the banking industry, the court referred to a clause in the contract similar to clause VI(D) in this case. *Id.* The court then held that the government was not liable for a taking of the acquirer's contract because the enactment of FIRREA had not deprived the plaintiffs of any remedy they previously had, including a cause of action for damages. *Id.*

Although the *Castle* court ruled that the plaintiff "retained the full range of remedies associated with any contractual property right they possessed," 301 F.3d at 1342, the court did not address what rights that "full range of remedies" included. In particular, the court did not address whether the contract shifted the risk of regulatory change onto the acquirer. *Castle* did no more than state that, since FIRREA did not result in a taking of the acquirer's contract, the acquirer could still pursue relief pursuant to that contract. Thus, the passage in *Castle* cited by Admiral does not address whether the purported risk-shifting clause shifted the risk of regulatory change to Admiral. To the contrary, the *Castle* court "expressly decline[d]" to reach the issue of the government's liability under the contract. *Id.* at 1339. *Castle* therefore does not compel a result different from that reached in *Guaranty* with respect to the risk-shifting issue.

■ The trial court in this case agreed with Admiral and ruled that Admiral did not assume the risk of the regulatory changes brought about by FIRREA. *See*

*Admiral I,* 54 Fed.Cl. at 256–57. The court reasoned that interpreting the RCMA to shift the risk of such regulatory changes to Admiral would mean that Admiral had "bargained away any ability to enforce [the government's] promises," which would "result in no promise at all," thus rendering the contract illusory. *Id.* at 256. For that reason, the court interpreted the provision as anticipating potential changes in the level of capital that thrifts must maintain, "or perhaps some other aspect of regulatory compliance," but declined to interpret that provision "as exposing Admiral to the risk of sweeping changes in the bargained for *method* by which capital is accounted for by the [Bank Board]." *Id.* at 257 (emphasis in original).

We disagree with the trial court's analysis on this point. Clause VI(D) does not contain any qualifications of the sort to which the trial court referred. The clause states that the government might make changes to the regulations that could increase Admiral's obligation under the contract. It does not limit those changes to increasing or decreasing the level of capital that thrifts must maintain, as opposed to changing the accounting methods the Bank Board requires. And as for the trial court's concern that the government's interpretation of the clause would render the contract illusory, the government's reservation of the right to change the extent of its performance as to some of its promises does not render the contract illusory as long as the government has otherwise given consideration, as is plainly the case here. *Restatement (Second) of Contracts* § 80(2) (1979) ("The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.").

The trial court relied on *Sterling Savings v. United States,* 53 Fed.Cl. 599 (2002), and *Southern California Federal Savings & Loan Ass'n v. United States,* 52 Fed.Cl. 531 (2002), as support for the proposition that the purported risk-shifting clause should not be interpreted to shift the risk of regulatory change from the government to the private party. *Admiral I,* 54 Fed.Cl. at 257. The contract at issue in *Sterling* included language similar to the language of clause VI(D) in Admiral's contract. The *Sterling* court read *Guaranty* as not holding that the purported risk-shifting clause mandated that the risk of regulatory change was shifted to the plaintiffs. Instead, the court in *Sterling* ruled that the risk-shifting clause meant that the acquirer could be required to comply with regulations regarding maintenance of capital levels, payment of dividends, and reporting of deviations from the business plan, but that the clause did not alter the government's obligation to allow the plaintiff to treat supervisory goodwill as an asset and amortize it over the period set forth in the contract. 53 Fed.Cl. at 614.

We do not believe *Guaranty* can be distinguished in that manner. The court in *Guaranty* found that the language in question altered the government's obligations with respect to the regulatory capital and amortization issues and shifted to Guaranty the risk of FIRREA's regulatory change with respect to those issues. The *Guaranty* court "interpret[ed] the contract to mean that Guaranty had the right to treat its goodwill as regulatory capital and amortize it over a twenty-five year period for so long as the statutes and regulations governing the area remained as they were when the agreement was signed." *Guaranty,* 928 F.2d at 1001.

In the other case on which the trial court relied, *Southern California Federal Savings & Loan Ass'n v. United States,* the language of the purported risk-shifting clause was significantly different from the language of the clause at issue here. The

clause at issue in *Southern California* merely stated that the acquirer was obligated to maintain capital in compliance with existing or future regulations. 52 Fed.Cl. at 545. The court in *Southern California* held that, while the clause at issue in that case bound the acquirer to follow the regulations, it did not preclude a finding of breach by the government if the regulations changed. *Id.* at 545–56. Thus, the provision stated the obvious—that the acquirer was bound by the law—without providing for any shift of risk in the event of a change in the law.

Language similar to that in the *Southern California* contract was included in the contract at issue in *California Federal Bank v. United States*, 39 Fed.Cl. 753, 778 (1997). The court in *California Federal Bank*, like the court in the *Southern California* case, held that the contract language before it was sufficiently similar to the contract language at issue in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), to be governed by the Supreme Court's conclusion that such language does not shift the risk of regulatory change to the acquirer. 39 Fed.Cl. at 779. The language of clause VI(D), on the other hand, is far more explicit with respect to the issue of regulatory change and makes clear that Admiral's obligations may increase or decrease under successor regulations.

The plurality opinion in *Winstar* addressed contract language similar to the language of the contracts in *Southern California* and *California Federal Bank* as follows:

> The Government also cites a provision requiring Statesman to "comply in all material respects with all applicable statutes, regulations, orders of, and restrictions imposed by the United States or ... by any agency of [the United States]," but this simply meant that Statesman was required to observe FIR-

REA's new capital requirements once they were promulgated. The clause was hardly necessary to oblige Statesman to obey the law, and nothing in it barred Statesman from asserting that passage of that law required the Government to take action itself or be in breach of its contract.

> . . . .

> We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence.

518 U.S. at 868–69, 116 S.Ct. 2432. Importantly, the opinion continued:

> To be sure, each side could have eliminated any serious contest about the correctness of their interpretive positions by using clearer language. *See, e.g., Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994, 999–1000 (C.A.11 1991) (finding, based on very different contract language, that the Government had expressly reserved the right to change the capital requirements without any responsibility to the acquiring thrift). The failure to be even more explicit is perhaps more surprising here, given the size and complexity of these transactions. But few contract cases would be in court if contract language had articulated the parties' postbreach positions as clearly as might have been done, and the failure to specify remedies in the contract is no reason to find that the parties intended no remedy at all.

*Winstar*, 518 U.S. at 869 n. 15, 116 S.Ct. 2432. As noted above, the "clearer language" that the opinion referred to as being used in the *Guaranty* case is identical to the risk-shifting language in clause VI(D) of the Admiral contract.

Thus, *Winstar* stands for the proposition that the government is still obligated to

honor its contracts even if the governing regulations change. *See* 518 U.S. at 869–70, 116 S.Ct. 2432 ("The drafters of the Restatement attested to this when they explained that, 'with the trend toward greater governmental regulation ... parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions....' *Restatement (Second) of Contracts* § 264, Comment a. 'Such an agreement,' according to the Restatement, 'is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law.'"). However, the plurality opinion in *Winstar* also recognized that the government could address the risk-shifting issue in bargaining and could even "reserve the right to change the capital requirements without any responsibility to the acquiring thrift." 518 U.S. at 869 n. 15, 116 S.Ct. 2432. Moreover, the example used by the plurality opinion for language that would have the effect of shifting the risk of a regulatory change to the private contractor was the contract language used both in *Guaranty* and in the contract with Admiral. Thus, following the lead of the Eleventh Circuit in *Guaranty* and the Supreme Court plurality in *Winstar*, we hold that Admiral assumed the risk of a regulatory change such as that brought about by FIRREA. For that reason, Admiral cannot recover damages based on the enactment of FIRREA and the promulgation of regulations pursuant to that statute that altered Admiral's obligations under the contract.

### III

■ Although the trial court did not agree with the government that the contract shifted the risk of regulatory change to Admiral, the court nonetheless rejected Admiral's claim for damages. The trial court based its ruling in part on its conclu-sion that even if the government breached a contract with Admiral, the enactment of FIRREA did not cause Admiral harm. *Admiral III*, 57 Fed.Cl. at 434–35. We uphold the trial court's disposition of the no-injury issue. Accordingly, on that ground as well, we affirm the trial court's ruling denying Admiral's claim for damages.

The trial court's no-injury finding was based on a detailed analysis of the financial status of Admiral and Haven and a careful assessment of the likely impact of the enactment of FIRREA on their fortunes. In particular, the court found that Haven was running operational deficits long before FIRREA was proposed, and that Haven was likely to continue running deficits in the future regardless of whether FIRREA was enacted. 57 Fed.Cl. at 434. The court also found that the real estate that Admiral contributed to Haven was selling at far below its appraised value at the time it was contributed, and that the goodwill for the contributed business was going to be written off, since the business did not actually exist. *Id.*

The court concluded that Haven "was in such dire straits that it was failing under pre-FIRREA capital requirements," and that

> [h]ad all its goodwill been counted toward its regulatory capital, Haven would still have been insolvent: Haven had negative core capital as of December 31, 1989. This means that even if Admiral had been able to replace all of Haven's goodwill with cash on September 30, 1989, Haven would still have been at least $4 million formally below its minimum capital requirement, and perhaps more than $10 million, counting expected real estate losses, and a write-off of the TSC business.

57 Fed.Cl. at 435.

Admiral argues that the enactment of FIRREA injured it by making it impossi-

ble for Admiral to find a merger partner or acquirer. Addressing that argument, the trial court acknowledged that FIRREA "did not help matters" for Admiral, but concluded that even without FIRREA, a potential acquirer would have had to compensate for a $12 million capital shortfall. 57 Fed.Cl. at 435. Admiral points to testimony to the effect that it was talking to potential merger partners at the time FIRREA was enacted. Admiral also points to a letter from Haven to the Bank Board referring to negotiations with potential acquirers who "seem[ed] quite interested in pursuing an assisted transaction." However, the letter also suggested that those negotiations would be in jeopardy if Haven were forced to liquidate real estate pursuant to the contract, since the bids Haven was receiving for the real estate were low. Thus, Admiral's evidence does not suggest that, absent FIRREA, Admiral would have been able to secure a merger partner or acquirer without either violating the liquidation schedule of the contract or obtaining additional concessions from the Bank Board. In any case, Admiral has not shown clear error in the trial court's finding that Admiral would not have found an acquirer or merger partner regardless of FIRREA.

Admiral further argues that because it sought restitution rather than damages, it is irrelevant whether the enactment of FIRREA was the cause of Admiral's loss. Admiral's position is that once the government breached the contract by enacting FIRREA, Admiral was entitled to elect restitution as a remedy and to recover its initial investment regardless of what would have happened in the absence of breach.

■ Although restitution ordinarily serves as a remedy for unjust enrichment, it has been recognized as an alternative measure of contract damages when a plaintiff's expectation damages are difficult to ascertain. *See Restitution of Restitu-*

*tion and Unjust Enrichment* § 38 cmt. a (Tentative Draft No. 3 2004) (" 'Restitution damages' ... are closely analogous in function to 'reliance damages,' in that both offer what is ordinarily a second-best alternative to a party injured by breach who cannot prove damages measured by expectation."). Thus, "[w]hen proof of expectancy damages fails, the law provides a fallback position for the injured party—he can sue for restitution." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001); *accord Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1309 (Fed.Cir.2004). In this case, as explained above, the trial court had ample evidence to conclude that Admiral's expectancy damages attributable to the government's breach were zero. It was not necessary for the trial court to use restitution as an alternative measure of damages, since expectancy was not in doubt.

■ Courts have also recognized the availability of restitution when a party injured by a contract breach is allowed to treat the contract as rescinded and to return to the status quo ante instead of relying on the terms of the contract to obtain damages or specific performance. *See Restatement of Restitution and Unjust Enrichment* § 37 and cmt. a (Tentative Draft No. 3 2004). However, an injured party is entitled to rescission only if the defendant repudiated the contract or committed a total breach. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000); *Hansen Bancorp,* 367 F.3d at 1309 & n. 10.

■ A "total breach" is a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Mobil Oil,* 530 U.S. at 608,

120 S.Ct. 2423, quoting *Restatement (Second) of Contracts* § 243 (1979); *accord Hansen Bancorp,* 367 F.3d at 1309, 1311–12 ("For our purposes, the critical part of this formulation is the statement that the breach 'substantially impairs the value of the contract to the injured party at the time of the breach.'"). In the event of such a breach, the non-breaching party is entitled to restitution whether the contract "would, or would not, ultimately have proved financially beneficial" to the non-breaching party. *Mobil Oil,* 530 U.S. at 608, 120 S.Ct. 2423.

In this case, as noted above, the trial court found that at the time of the breach Admiral was in such dire straits that it would not have been able to recover, even absent a breach. Thus, the court found that even under the pre-FIRREA requirements Admiral would not have been able to infuse enough capital in the thrift to avoid receivership. Given Haven's condition in 1989 and 1990, the trial court found that the enactment of FIRREA had no practical effect on Admiral's ability to find the necessary additional funding for the thrift. Therefore, the government's action did not "substantially impair[ ] the value of the contract to the injured party at the time of the breach" so as to make rescission an appropriate remedy. *Mobil Oil,* 530 U.S. at 608, 120 S.Ct. 2423. As the trial court stated, "[t]he fact that FIRREA was passed in the middle of Admiral's cure period is sheer happenstance." *Admiral III,* 57 Fed.Cl. at 432.

Moreover, even if the remedy of restitution would otherwise be appropriate, this court has noted that restitution should not be awarded if it would result in a windfall to the nonbreaching party. *See Hansen Bancorp,* 367 F.3d at 1315. In this case, the trial court found that Haven's problems began long before FIRREA was proposed, enacted, or implemented, and Haven's financial situation continued to deteriorate both before and after FIRREA's enactment. Congress enacted FIRREA after Admiral was already in default, and only weeks before the end of Admiral's cure period. The trial court concluded that the government's breach did not significantly affect Admiral's prospects of profiting from the contract or its opportunity to find a merger partner or acquirer. Allowing Admiral to rescind the contract and obtain full restitution would afford it a windfall, contrary to the equitable principles on which the remedy of restitution is based. *See Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980) (declining to order rescission because it would give plaintiff a windfall in a setting in which there was "no reason to relieve [plaintiff] of his investment's downside risks"). For that reason as well, we hold that the trial court did not err in denying Admiral's request for an award of restitution.

## IV

Admiral asserts that the trial court erred in concluding that Admiral anticipatorily breached the contract. Because we decide that Admiral may not recover on the contract both because it assumed the risk of regulatory change and because the enactment of FIRREA did not harm Admiral, we need not reach the issue of anticipatory breach. In light of our rulings on those two issues, we also find it unnecessary to address the government's argument that no enforceable contract was formed between the government and Admiral.

*AFFIRMED.*