SOUTHWEST INVESTMENT COMPA-
NY, INC., On Behalf of Itself and On
Behalf of First Louisiana Federal Sav-
ings Bank, Plaintiff,

v.

The UNITED STATES of
America, Defendant.

No. 95–544C.

United States Court of Federal Claims.

Filed: Nov. 23, 2004.

Corrected Version Filed Dec. 15, 2004 *.

James R. Lewis, Crawford & Lewis, Baton
Rouge, L.A., attorney of record for Plaintiff

---

\* This version corrects a misstatement as to the
Government's position in section II.B. of the
Opinion. The corrected text is highlighted.

Original filing and judgment dates remain the
same.

Southwest Investment Company, Inc. With him on the briefs was Catherine S. St. Pierre, attorney, who also argued at oral argument.

Jeffrey T. Infelise, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for the Defendant, argued at oral argument. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; William F. Ryan, Assistant Director; and Colleen A. Conry, Trial Attorney.

Tahmineh I. Maloney, law clerk.

### OPINION

BASKIR, Judge.

Plaintiff, Southwest Investment Company, Inc., brings this *Winstar*-related case on behalf of itself and as a successor in interest to the First Louisiana Holding Company (Holding Company or FLHC) and its now defunct subsidiary First Louisiana Federal Savings Bank (First Louisiana). The history of *Winstar*-related litigation is well documented and we need not repeat it here. *See generally United States v. Winstar Corp.*, 518 U.S. 839, 844–48, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *see also Southern California Fed'l Sav. & Loan Assoc. v. United States,* 52 Fed.Cl. 531 (2002). In short, the Plaintiff alleges that the Government breached a contract with First Louisiana through its enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, on August 9, 1989.

On October 27, 2003, the Court held a status conference at which the Court and the parties agreed that the issues and the record with respect to liability, especially contract formation and prior material breach, were significantly more complex than those relating to damages. A closer examination of the Plaintiff's damage claims led to the hypothesis that a resolution of damages would likely render liability issues moot. Consequently, the most expeditious way to resolve this case was to address damages first. Accordingly, the parties each filed cross-motions for summary judgment on damages. For the pur-poses of this decision, we assume—without deciding—that a contract existed between the parties; that the enactment of FIRREA breached that contract; and that there was no prior material breach by the Plaintiff—all hotly disputed issues.

The Plaintiff presented three damage claims: a claim for restitution-based damages seeking a return of the $4 million cash contribution made by the Holding Company at the time of contract formation; a claim based on the value of the "benefit of time" conferred upon the Defendant; and a restitution-based claim seeking a return of subsequent contributions made by the Holding Company. We conclude that FIRREA had no harmful effect on First Louisiana, which was insolvent notwithstanding FIRREA. For this and other reasons, the Plaintiff's damage claims fail. **We therefore deny the Plaintiff's Motion for Summary Judgment on Damages, grant the Defendant's Motion for Summary Judgment on Damages and dismiss the Complaint.**

We begin this discussion with a recitation of the formation of First Louisiana, its merger with Union Federal Savings and Loan (Union), and its eventual demise. We treat at some length its financial history between mid–1985, when the merged institution began operations, and its insolvency in late 1988 and early 1989.

### I. BACKGROUND

Except where otherwise indicated, the following facts are not in dispute.

#### A. The Formation of First Louisiana Federal Savings Bank

In early 1984, several local business leaders in Lafayette, Louisiana, formed the First Louisiana Holding Company. Mr. Jerry Brents, a local bank president, was hired as FLHC's Chief Executive Officer (CEO) and president. He also served on its board of directors. Mr. Brents later served as the president and CEO of First Louisiana and as a member of its board of directors. In June of 1984, FLHC submitted an application to the Federal Home Loan Bank (FHLB) of Dallas, requesting permission to form a *de novo* institution, First Louisiana

Federal Savings Bank. The Holding Company also wholly owned two additional subsidiaries: FirstBanc Mortgage Corporation (FirstBanc), a service corporation, and First Louisiana Insurance Corporation. First Louisiana later acquired FirstBanc from the Holding Company on August 31, 1986.

Prior to the enactment of FIRREA, the Federal Home Loan Bank Board (FHLBB) was the primary regulator of federally-chartered savings and loan institutions. *See generally* 12 U.S.C. § 1464 (1982). The FHLBB established policies for the supervision of individual institutions and the Federal Savings and Loan Insurance Corporation (FSLIC). *Id.* The FSLIC administered a fund that insured deposits held by thrift institutions. 12 U.S.C. § 1726 (1982).

Subsequent to its application, First Louisiana began merger negotiations with Union Federal Savings and Loan, an existing troubled thrift. Thereafter, the parties pursued the creation of the *de novo* bank and its merger with Union simultaneously, but in formally separate transactions. The Plaintiff alleges there is evidence in the record to support its contention that the FHLBB made the merger with Union a condition of its approval of the *de novo* application. *See* Affidavit of Jerry Brents (Jan. 13, 2004) at 1,2 (stating that a FHLBB agent informed the FLHC that it would not receive a *de novo* charter unless it took over Union); *see also* First Louisiana Capital Restoration Plan (Nov. 19, 2003) at 459 (stating that the FHLB of Dallas "solicited" First Louisiana to consider the unassisted acquisition of Union as an "incentive" to the granting of the *de novo* application). A resolution on liability would require at the least a determination of whether there were two separate transactions, or one transaction in two phases.

As a condition of the *de novo* application, the Holding Company was required to execute a formal Net Worth Maintenance Agreement (NWMA), which was signed on October 29, 1984. At this time there was as yet no formal merger agreement with Union, much less an application for approval by Government regulators. *See* FHLBB Resolution No. 84–571 (Oct. 22, 1984) (discussing rules and regulations relating to insurance of accounts of *de novo* institutions; applications processing). Among other things, the NWMA, like similar commitments found in other *Winstar* cases, obligated the private parties to maintain the capital of the institution and to replenish it should the bank's capital fall below required levels. The obligations extended to required capital levels established by current or future regulation. However, neither the FHLBB nor the FSLIC signed this paper. Among the questions provoked by this document is whether it is evidence of an agreement between the parties, and whether it was enforceable against the Plaintiff. *See* FHLB of Dallas Inter-office Memorandum (Apr. 18, 1989) (discussing the enforceability of the NWMA—"a rather grey area of the law").

As another condition of FHLBB approval, the FLHC was required to invest "at least" $3 million in the new bank. FHLBB Resolution No. 85–75 (Jan. 29, 1985). In fact, the Holding Company invested $4 million. One unresolved damages issue is whether the money-back restitution should be limited to $3 million, instead of $4 million as Plaintiff claims. For purposes of the pending motion, we will assume—again without deciding— that the appropriate figure is $4 million.

On January 29, 1985, the FHLBB formally approved the creation of the *de novo* institution, First Louisiana. *See* FHLBB Resolution No. 85–75 (Jan. 29, 1985). Neither the formal approval resolution, 85–75, nor the earlier FHLB of Dallas analysis of September 19, 1984, mentions a possible merger with Union. FHLB of Dallas Interoffice Memorandum (Sept. 20, 1984). The newly formed bank had its first organizational meeting on March 11, 1985. *See* Minutes of a Special Meeting of the Board of Directors of First Louisiana Federal Savings Bank (Mar. 11, 1985). The board members marked the occasion by voting each other a $100,000 line of credit, $20,000 of which may be unsecured. Each board member was careful to abstain when his particular line of credit was voted on.

### B. The Union/First Louisiana Merger

The Union/First Louisiana merger had its apparent beginnings in mid–1984, after the filing of the June formal application to create

First Louisiana as a new banking entity. An informal agreement between First Louisiana and Union was reached in October and formalized on November 28, 1984. *See* Agreement, Plan of Conversion and Merger (Nov. 28, 1984). Among other things, the agreement required FLHC to capitalize the newly merged institution at $4 million. In December, the Holding Company wrote to the FSLIC formally seeking approval of the merger. Letter from Mr. Brents to the FHLBB (Dec. 31, 1984). The FLHC requested several forbearances as part of the merger, of which two are particularly significant.

First, the FLHC requested that the purchase method of accounting be applied, and that any resulting goodwill could be, at its option, counted for supervisory capital requirements. The goodwill was to be amortized over forty years. Second, for a period of five years, losses from transactions exclusively involving Union assets and liabilities would not be the basis for any supervisory action by the FHLBB. Although not pertinent to any dispute between the parties, there was a third forbearance. FLHC asked that the merged Union/First Louisiana entity be considered as having existed for twenty years and not as a new bank, for purposes of determining capital requirements.

On June 13, 1985, some four and a half months after FHLBB approval of the creation of First Louisiana, the FHLBB issued Resolution No. 85–477, giving conditional approval to the merger between Union and First Louisiana. As a condition of approval, the resolution required the parties to stipulate in writing within 30 days that the FLHC would maintain the capital of the merged institution:

> for as long as it is in control...at not less than a level consistent with that required by Section 563.13(b) of the Insurance Regulations, as now or hereafter in effect...and where necessary, that it will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

*Id.* at 4. We note that this language obligated the investors to maintain capital at whatever levels and form as from time-to-time might be required by the then-applicable regulations. A letter purportedly meeting these requirements was sent to the FHLBB on July 29, 1985, and signed by Mr. Brents. (A copy of the actual agreement, which was attached as an exhibit to this letter, has not been provided by the parties and is therefore not a part of this record.)

On June 13, the FHLBB sent a letter to the FLHC setting forth the forbearances granted as part of the merger. The FHLBB accounted for the transaction under the purchase method of accounting. Under the purchase method of accounting, the market values of the acquired assets in total were lower than the market value of the deposits and other liabilities, resulting in excess liabilities of approximately $5.8 million. The $5.8 million was recorded as goodwill, to be amortized over 40 years. The FHLBB also granted the Holding Company's request that it would not take supervisory action for a period of five years for losses resulting from transactions involving Union assets and liabilities.

### C. A Short, Unhappy Life

The newly merged institution came into existence on July 1, 1985, and had its first board meeting on July 10. In addition to its previously granted general authority, the board specifically authorized the sale of one particular type of Union asset at a profit. Thus, the new, merged institution started off by realizing some extraordinary gains from the sale of Union's best loans. First Louisiana showed a net profit of $445,700 in 1985. *See* First Louisiana Holding Company, 1985 Annual Report at 2. However, had the trading profits been eliminated, First Louisiana would have shown a loss approaching $1 million. *See* Handout, First Louisiana Management Retreat and Seminar (Mar. 5–7, 1986) at 2.

And then disaster struck. First Louisiana's oil-dependent community suffered a severe economic downturn in 1986. During the first half of 1986, oil prices dropped by almost 50%. Oil-related businesses suffered and failed. Unemployment in Louisiana increased to 13.2%, compared to 6.7% nationally. Homeowners were increasingly unable to

repay their mortgages. In its 1987 Annual Report, FLHC characterized the situation as a "near-depression economy."

After 1985, First Louisiana never had a profitable year. Between 1986 and 1989, the bank's financial condition deteriorated. In 1986, it recorded losses of $526,408. *See* First Louisiana Federal Savings Bank Consolidated Financial Report (Dec. 31, 1986 and 1987). In 1987, it recorded losses of $3,864,095. *Id.* Its losses jumped to $9,026,399 in 1988. *See* Consolidated Statement of Financial Condition for December 31, 1988. In addition to the adverse impact of the regional economic situation, FLHC also suffered from management and other institutional weaknesses.

### 1. 1986 Report of Examination

On February 26, 1986, the FHLB of Dallas conducted the first examination of First Louisiana. *See* Report of Examination (Feb. 26, 1986). The report prepared as a result of that examination revealed problems in several key areas: management, risk management, asset quality, and operating results. The examiners strongly condemned perceived deficiencies on the part of the board of directors of First Louisiana, including its willingness to allow "others" to make major decisions. "These deficiencies, as well as observations made during the course of the examination, strongly denote[d] a lack of responsibility and direction on the part of the board of directors." *Id.* at 5.

Several transactions that violated restrictions on dealings with insiders were of particular concern. For instance, FLHC leased its main office building from 2014 Pinhook Partners (Pinhook Partners). Directors Bauer, Brents, and Knight of FLHC were also the "managing partners" of Pinhook Partners. Pinhook Partners purchased the building from its original owner after it had already been leased to FLHC. After the purchase, FLHC's board amended the lease, which resulted in FLHC paying $14 a square foot for an unoccupied and unimproved section of the building. In general, the rates on occupied sections of the building appeared "high as compared to the area market rates." *Id.* at 6. Director Knight also owned the management company hired to manage the building, John Knight Management.

Loans were made to entities in which directors Bauer and Knight had a significant interest. It appears fair to characterize many transactions as particularly favorable to First Louisiana's president and CEO, Mr. Brents, who was also the president and CEO of the Holding Company. Loans were made at a favorable rate to directors of an institution at which Mr. Brents was a borrower. In addition to his annual salary of $150,000, he also received free use of the company vehicle, a 1985 Jaguar XJ6, payment for the security alarm system at his personal residence, and payment of dues to private organizations in the amount of $450 per month.

The report also detailed various deficiencies in internal control procedures, including insufficient controls for passbooks and certificates. The books and records provided to the examiners were "often times confusing and, in numerous instances, lacked adequate information." *Id.* at 11.

The examiners also expressed concern with First Louisiana's risk management. The board of directors had failed to establish specific written policies and internal control procedures in regard to futures and options transactions. First Louisiana was "deeply" involved in these "volatile" transactions, "which can easily devastate an institution without proper safeguards." *Id.* at 12. During the nine-month period ending March 31, 1986, First Louisiana netted $1,887,000 in income from the sale of investments, primarily through futures and options transactions, as compared to its overall net income of $695,000. The difference of over $1 million was attributed to operating losses. Although the report did not raise warning signals about capital, barely 15 months after the February 1986 assessment, Mr. Brents was already advising of dire capital problems.

### 2. January 1987 Report of Examination

On November 24, 1986, the FHLB Office of Regulatory Functions commenced a second examination of First Louisiana, including the recently acquired FirstBanc. *See* Report of Examination (Jan. 22, 1987). The primary purpose of this "Special Limited" examination was to check on management's progress

in taking corrective steps since the date of the last examination. The current review concluded on January 22, 1987.

The examination highlighted problems in several key areas. Most of the earlier identified loan underwriting deficiencies still existed; record-keeping continued to be a problem area; the required fidelity bond insurance had not yet been obtained; two directors missed a substantial number of board meetings; and necessary changes in the by-laws had not been made. This "Special Limited" examination was particularly concerned with major mortgage loan underwriting ($500,000 or greater). Accordingly, the examiner reviewed major loans, as well as other loan purchases and commitments. The report stated that most of the same deficiencies noted at the previous examination, primarily regarding financial analysis and appraisal deficiencies, were still evident.

On July 15, 1986, First Louisiana purchased a loan of $4,200,000 from Interfirst Bank Houston, N.A. (Interfirst) for $3,850,000. The loan was an "Asset Subject to Special Comment" in the January 1987 report, which stated concerns regarding the future collectibility of the debt. The report identified significant flaws in First Louisiana's analysis of the financed project's projected income, an analysis central to a determination of financial risk:

> A series of income analyses dated October 24, 1985, indicates that project income was analyzed by First Louisiana from a number of different scenarios (all of which dealt with the conditions other than those under which the loan was purchased). There is *no evidence of First Louisiana* having used the actual expenses, income, and occupancy of the project to analyze the ability of the project to repay the loan, even though this information was available.

*Id.* at App. 13.2. Moreover, the borrower had no cash equity invested in the project—the mortgages acquired as of the loan purchase date equaled 106% of the sales price. In conclusion, the report stated, "[b]ased upon the numerous areas of concern disclosed in this comment, it appears First Louisiana has assumed too great a level of credit

risk on this speculative project." *Id.* at App. 13.5.

Finally, in assuming that risk the regulators expressed concern that the purchase of the note from Interfirst was approved by several directors, Brents, Bauer, Melton, Knight, and Blanda, who were signatories of a $2,800,000 note at Interfirst. Their note at Interfirst was for the purpose of capitalizing First Louisiana, against which their shares in FLHC were pledged. "The fact that all of the directors who voted on the purchase of a speculative loan from Interfirst were indebted to Interfirst could be construed as giving the appearance of a conflict of interest." *Id.*

### 3. October 1987 Report of Examination

On July 20, 1987, the FHLB Office of Regulatory Functions conducted a third examination of First Louisiana which concluded on October 16, 1987. *See* Report of Examination (Oct. 16, 1987). The most serious area of concern for the regulators was First Louisiana's failure to meet its minimum regulatory capital requirement. The report's comments were particularly ominous. Even at this date First Louisiana had "failed to meet its minimum regulatory capital requirement." *Id.* at 1. The regulators questioned "its ability to meet that requirement in the future without capital infusion." *Id.*

The report's overall outlook was not positive: "First Louisiana has been unprofitable for the past six quarters and it appears that losses will continue." *Id.* First Louisiana reported that it complied with the required capital level. However, after adjustments by the examiner for components of problem assets, it became apparent that First Louisiana failed to meet its minimum regulatory capital requirement. Specifically, a net worth deficiency of $696,000 was indicated as of June 30, 1987. *Id.* at 17. The calculations used to reach that figure reflected the forbearance granted in connection with the Union merger. The examiners believed that the situation might improve through a capital infusion either through the sale of off-balance sheet loan servicing or through a contribution from FHLC, which had liquid assets of $2.4 million. *Id.*

In the area of management, the report noted that "most" of the deficiencies cited in

the two previous examinations had been corrected. The uncorrected deficiencies included:

> loans for commercial purposes to director Bauer with an aggregated loan amount in excess of $100,000, entering into new leases with an affiliated person without prior supervisory approval, inadequate policies for forward commitments, future and options transactions, and some internal control deficiencies.

*Id.* at 2. Director Bauer's aggregate outstanding debt for commercial purposes totaled $200,000 at this time, in violation of regulations. Various other improper loans were also made. Residential loans in undisclosed amounts to three affiliated persons were not approved by the entire board with full disclosure. Protections were not in place to ensure that the loans were made on terms comparable to those available to the general public. In addition to Director Bauer, two other affiliated persons received loans for commercial purposes in amounts exceeding $10,000 without complying with applicable regulations.

First Louisiana entered into new leases with Pinhook Partners without prior approval of the supervisors. These new leases gave the "appearance of a conflict of interest" mainly due to a failure to properly document the transaction. *Id.* at 3. "Management failed to handle the transaction in a businesslike manner, apparently due to the relationship of the parties involved." *Id.* While the new leases benefited First Louisiana more than the earlier leases, they were not properly approved and executed.

First Louisiana failed to comply with regulations in certain real estate purchases and futures and options trading activity. Its system of internal control was inadequate to insure ongoing compliance with the Bank Secrecy Act. Other deficiencies in internal controls existed as well, including some that had been noted in the examination report prepared in February 1986.

The examiners expressed concern with First Louisiana's asset quality. "The amount of criticized assets are of concern and the level of general reserves currently established may be inadequate to absorb the total losses which could be sustained." *Id.* at 11. These criticized assets totaled $10,257,000, or 7% of the total assets of First Louisiana. One loan of particular concern was that made to Kenneth J. Guilbeaux for $1,083,000. Mr. Guilbeaux was both an organizer of First Louisiana and a one-time board member who resigned in July 1985. Fifteen Arabian horses of "an uncertain value" were the primary collateral securing his debt. Appraisals documenting the value of the horses were not available. The only documentation supporting the value of the horses was insurance coverage in the amount of $757,000. The examiners noted that if the value of the horses was not substantiated in the future a more adverse classification of the debt might ensue.

Under operating results the examination report noted that First Louisiana had been unprofitable for the past six quarters and that it appeared that losses would continue. *Id.* at 18. Its most recent operating results revealed net losses of $738,000 and net operating losses of $145,000 incurred during the six-month period ending June 30, 1987.

First Louisiana's high operating expenses contributed to its poor results. For the year ending December 31, 1986, First Louisiana's total operating expenses were $4,482,000, or 3.7% of total assets, while its peer group average was only 2.1% of total assets. In comparison, First Louisiana's operating expenses were 75% more than the peer group for 1986. A review of the expenses in 1987 indicated that the trend of high expenses was continuing. In particular, First Louisiana's compensation was 55% more than the peer group average for the year ending December 31, 1986. *Id.* at 19. Compensation in 1987 had decreased only slightly in comparison.

Fixed asset expense for First Louisiana in 1986 was more than 125% of its peer group. The high fixed asset expense "was apparently caused by leasing more office space than needed, paying higher rent than other institutions, and having high depreciation expense due to a large dollar amount of leasehold improvements." *Id.* at 19. In the February 1986 report, the examiners expressed concern with certain leases with

Pinhook Partners because they were executed with an affiliated person, charged rent that appeared to be high in comparison to market rates, and included charges for unused space. In the October 1987 report, Mr. Brents responded that they were in the process of lowering both compensation and fixed asset associated costs.

On August 31, 1986, First Louisiana acquired FirstBanc Mortgage Corporation, a financial service corporation, from the Holding Company. Since its acquisition by First Louisiana, FirstBanc had incurred losses totaling $479,000. Because of these losses, FirstBanc was in the process of being reorganized during the 1987 review.

### 4. First Louisiana's Capital Deficit

At a First Louisiana board of director's meeting held on June 18, 1987, Mr. Brents stated that First Louisiana's primary concern was to strengthen its capital base. *See* Minutes of the Board of Directors Meeting of First Louisiana Federal Savings Bank (Jun. 18, 1987). First Louisiana's Consolidated Financial Report showed a net loss of $3,864,095 for 1987.

At a meeting held on April 29, 1988, the board of directors of FLHC discussed the financial state of First Louisiana. *See* Minutes of the Special Board of Directors of First Louisiana Holding Company (Apr. 29, 1988). They discussed the advantages and disadvantages of various methods of infusing capital into First Louisiana, but declined to contribute any themselves at that time. Mr. Brents explained that although First Louisiana could not survive without a capital infusion, FLHC did not want to "throw good money after bad." Deposition of Jerry W. Brents (Jun. 14, 2000) at 165–66; *see also* Deposition of Jerry W. Brents, continuation (Jun. 29, 2000) at 295.

On October 7, 1988, Mr. Barclay, a regulator with the FHLB of Dallas, wrote to First Louisiana advising Mr. Brents that First Louisiana was regarded as a "Troubled Institution," under then-applicable regulations. The designation required First Louisiana to significantly limit its activities. For example, it could not make consumer and education loans in excess of $50,000. Accord-

ingly, Mr. Barclay directed First Louisiana to submit a detailed capital restoration plan.

### 5. February 1989 Capital Restoration Plan

First Louisiana submitted its Capital Restoration Plan on February 15, 1989. *See* Capital Restoration Plan for First Louisiana Federal Savings Bank (Feb. 15, 1989). The plan's summary stated First Louisiana had accumulated almost $11 million in losses and conceded it was "nearing insolvency" notwithstanding the merger forbearances:

> Through December 31, 1988, the cumulative losses for First Louisiana amounted to $10,938,000. Of these losses, $7,132,000 were attributable to losses on the Union Federal assets and $3,806,000 were attributable to the assets originated by First Louisiana. Although First Louisiana was granted certain forbearances in connection with the unassisted supervisory merger with Union Federal, *First Louisiana is nearing insolvency,* even with these forbearances.

(emphasis added). First Louisiana attributed its losses to the decline in the local and national economy:

> In early 1986, the price of oil plummeted to $10 per barrel causing severe economic declines and major business failures involving oil and gas related companies in the states of Oklahoma, Texas and Louisiana. A collapse of the real estate market in the area served by First Louisiana followed.

We digress to note that as of this writing in late 2004, oil prices have exceeded $55 a barrel, an historic high.

The Capital Restoration Plan expressed hopes of a recovery in the near future but conceded that "the decline in real estate values has continued and shows no signs of recovery." Based upon an assumed and optimistic scenario in which the decline in property values had "reached bottom," First Louisiana conceded that it would take "5 to 7 years for the values to restore to the levels of the early 80's."

As a proposed solution, the board of directors stated their belief that they could raise additional capital, "but not without some form of FSLIC assistance." Three

plans were proposed, each involving different levels of Government assistance and capital contributions. Each scenario depended on a significant FSLIC cash infusion and each retained the existing management. First Louisiana did not offer any prospect of a capital restoration from solely private sources.

Scenario I, titled Assistance with Union Federal, requested FSLIC assistance for a period of five years with assets acquired from Union and the related capital and operating losses incurred on those assets. The requested assistance was to be in several forms, including an uncollateralized FSLIC note for approximately $10 million that was to cover goodwill and operating losses resulting from the Union merger. FSLIC coverage of continuing capital and operating losses resulting from the assets acquired from Union was also requested. For consideration of the FSLIC assistance, First Louisiana offered to raise additional cash equity of either $2 million or in an amount to bring net worth up to 3%, FLHC would retain some percentage of ownership in the resulting institution. First Louisiana also offered non-cash equity consideration, including profit participation.

Scenario II, titled Assisted Acquisition of First Louisiana Federal Savings Bank, stated that the directors of First Louisiana believed they could raise sufficient outside capital to recapitalize the institution, as long as the FSLIC was willing to provide assistance for the transaction for a period of five years. In return for raising outside capital, the investors expected to retain some ownership in the resulting institution. In this scenario, among other requests, First Louisiana sought an uncollateralized FSLIC note for approximately $4 million, coverage of continuing capital and operating losses from acquired assets, and coverage of losses on the sales of investment securities of approximately $5 million.

While the requested FSLIC note was for less than that requested in Scenario I, First Louisiana noted that the cost to the FSLIC would be greater in this scenario because of the requested assistance for covered asset and capital and operating losses. For consideration, First Louisiana offered to raise approximately $5.5 million. Also, First Louisiana offered non-cash equity, again including profit sharing.

Scenario III, titled Assisted Acquisition of First Louisiana Federal Savings Bank and Evangeline, outlined the directorate's plan for a recapitalization of First Louisiana combined with its merger with Evangeline, an insolvent institution in the same market area. The assistance was requested for a period of five years. Scenario III proposed that the FSLIC provide an uncollateralized note for approximately $38.5 million. The FSLIC was expected to cover the continuing capital and operating losses resulting from acquired assets and cover losses on the sales of investment securities of approximately $10 million. In exchange, First Louisiana proposed that it would raise approximately $7.8 million in cash and would attempt to persuade the new investors to return to the FSLIC certain tax benefits.

The regulators did not approve any of the plans. The record fails to show any capital infusion into First Louisiana by the Holding Company, or any other source despite the obvious need.

### 6. March 13, 1989 Financial Summary

By March 1989, outside auditors expressed "substantial doubt about First Louisiana's ability to continue as a going concern." *See* Independent Auditor's Report (Mar. 27, 1989). They calculated First Louisiana's net worth at a deficit of almost $8.3 million as of December 31, 1988. On March 13, 1989, Sandi Chalmers, First Louisiana's comptroller, prepared a financial summary for the board. *See* Interoffice Memorandum from Sandi Chalmers to Board of Directors (Mar. 13, 1989). A "significant" outflow of deposits had occurred due to "[t]he negative publicity that the savings and loan industry in general and First Louisiana in particular have experienced." *Id.* at 55. On a Generally Accepted Accounting Principles (GAAP) basis, the net worth of the bank was ($9,913,000)—the figure in parenthesis indicating a negative amount. On a Regulatory Accounting Principles (RAP) basis, the net worth of the bank was ($7,188,000). The Union forbearance figure was put at $7.1 million. Ms. Chalmers concluded, "[t]hus, the Bank is RAP and

GAAP insolvent, and there is no shareholder equity value." *Id.* at 58.

### 7. 1989 Report of Examination

On January 9, 1989, the FHLB of Dallas commenced its last examination that concluded on June 5, 1989. *See* Report of Examination (Jun. 5, 1989). In that examination First Louisiana was assigned a MACRO rating of 5. MACRO was an acronym employed at the time to evaluate a banking institution in five different categories—management, assets, capital, risk management, and operations, with a MACRO 1 being the highest, and 5 the lowest rating. A MACRO 5 was assigned to institutions in imminent danger of failure and needing immediate correction, with regulatory action necessary. A MACRO rating of 5 identified:

> institutions with an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from shareholders or other sources. Such institutions require immediate corrective action and constant supervisory attention. Obviously, formal administrative action is presumed necessary. The probability of failure is high for these institutions. Institutions with negative capital and those with negative generally accepted accounting principles (GAAP) capital and experiencing operating losses would normally be assigned this rating.

*Id.* at 1. The examination report went on to state that First Louisiana had experienced operating losses in excess of $13 million since its previous examination in July 1987. At the time of the 1989 exam, First Louisiana was insolvent with a negative regulatory capital of $5.4 million, and perhaps as high as $7.6 million with expected losses. The regulators attributed its insolvency largely to "the decline in property values, unemployment, high delinquencies and classified assets." *Id.* However, they placed the major blame on management and the board:

> However, the unsafe and unsound loan underwriting practices and violations of loan regulatory requirements discussed in this report and in each of the two preceding examination reports provide ample evidence that the major factor leading to

insolvency has been the failure to ensure supportable and prudent loan underwriting on many loans which have since become problem assets. . . . Many of these deficiencies recurred despite promises to Supervision that corrective action would be taken.

*Id.* at 4.

The examiner's report also took into account the effect of the forbearances granted due to the Union transaction: "[h]owever, adjustments to the capital account for operation and allowances for loan losses attributed solely to assets of First Louisiana discloses (sic) a negative regulatory capital of approximately $460,000." *Id.* at 2. In other words, First Louisiana was insolvent notwithstanding the Union forbearances: "had the Union Federal merger never occurred, [First Louisiana] would still be insolvent." *Id.* at 3. The examiners noted that Mr. Brents did not agree with the regulatory capital requirement presented in their report. *Id.* at 26. Mr. Brents contended that the Union liabilities should be calculated at their merger value in 1985, a position rejected as inappropriate because it was not in conformity with the forbearance terms, and failed to account for the 50% decline in those liabilities to date. *Id.* at 27.

### D. The Closing Chapter

The 1989 Report of Examination was forwarded to the Holding Company by a July 27 letter from Mr. Jack Anderson of the FHLB of Dallas. *See* Letter from Mr. Jack Anderson to FLHC Board of Directors (Jul. 27, 1989). In it he highlighted the major findings of the examination. He stated that the bank was insolvent, and demanded that the board of the Holding Company contribute capital to First Louisiana within 60 days, in accordance with the NWMA. Mr. Anderson cited the NWMA signed by the FLHC in October 1984 in connection with the *de novo* application to create First Louisiana. He said the investors were in default of the NWMA and warned that failure to contribute the required capital would require that the bank's shares be transferred to the FSLIC. The board declined to do so. *See* Letter from the FLHC Board of Directors to Mr. Jack Anderson (Aug. 30, 1989).

Congress enacted FIRREA on August 9, 1989. Pub.L. No. 101–73, 103 Stat. 183. Among other institutional changes, the FHLBB was replaced by the Office of Thrift Supervision, and the FSLIC by the Federal Deposit Insurance Corporation. The Resolution Trust Corporation was created to dispose of failed thrifts, either through management, liquidation, or otherwise.

On August 15, 1989, Mr. Anderson wrote to the board of First Louisiana, highlighting certain aspects of the 1989 Report of Examination and requiring corrective action in numerous areas. *See* Letter from Mr. Jack Anderson to First Louisiana Board of Directors (Aug. 15, 1989). He also requested that the board execute a "consent agreement," due to the bank's insolvent status. The consent agreement provided that First Louisiana was in violation of regulations, that grounds existed for the newly created Office of Thrift Supervision to appoint a conservator or receiver, and that accordingly, the institution should agree to certain operating restrictions. The board declined to execute the consent agreement. *See* Letter from First Louisiana Board of Directors to Mr. Jack Anderson (Sept. 21, 1989).

On August 30, the Holding Company, in somewhat of an anti-climax, forwarded its formal response to the 1989 Report of Examination. *See* Letter from FLHC Board of Directors to Mr. Jack Anderson (Aug. 30, 1989). The response acknowledged the bank's losses but said nothing direct about its capital situation. For the most part, it defended against the Report's criticisms of management. In the end, it attributed the situation to the bad Louisiana economy and the Union merger. On November 1, 1989, the OTS seized First Louisiana. This was one month before FIREEA's implementing regulations came into effect, on December 7, 1989. The Resolution Trust Corporation was appointed as receiver, and in November of 1990, sold the remaining assets of First Louisiana.

## II.  PRELIMINARY MATTERS

### A.  *Legal Standards*

We apply the well-known legal standards for resolving motions for summary judgment.

*See generally* Rule 56 of the Rules of the United States Court of Federal Claims (RCFC); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One precept precludes a decision on the merits of the motion if material facts are in dispute. RCFC 56(c). However, the disputed fact must be material to the issue. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact"). The governing substantive law identifies the facts that are material. *Id.* at 248, 106 S.Ct. 2505. Material facts are those facts that may affect the outcome of the litigation. *Id.*

The Plaintiff alleges that disputes of material fact exist that would preclude this Court from granting the Defendant's Motion for Summary Judgment. Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This does not require the nonmoving party to produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Id.* The form of this evidence may be of the sort listed in Rule 56(c), except that a nonmoving party may not rest upon the pleadings themselves. *Id.* The non-moving party may not establish a factual dispute merely by disagreeing with the movant's assertion, or by a general denial: "[t]he party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). "Mere denials or conclusory statements are insufficient." *Id.* The non-movant must offer contrary facts, putting the movant's assertion in doubt, and requiring a resolution by the trier of fact. In this case, the Plaintiff has at-

tempted to create disputes of fact but has done so in a legally inadequate manner.

In the Consolidated Statement of Uncontroverted Fact (CSUF), the instrument by which a movant asserts a fact and seeks a challenge or an admission, the non-movant is required to cite to record evidence to contradict the movant's assertion. *See* Special Procedures Order (filed December 29, 2003). The CSUF combines the filings required by Rule 56(h) into one document. Rule 56(h) requires parties to cite to record evidence in claiming or disputing material facts:

> In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted by affidavit or other written or oral evidence.

RCFC 56(h)(3).

In a number of instances, Plaintiff replies to the Government assertions of proposed undisputed fact by stating the "Plaintiff does not object to the proposed findings of fact. . .to the extent that Plaintiff agrees that this is the Defendant's expert, [S.] Thomas Cleveland's opinion." *See, e.g.,* CSUF at 48–50. That may be, but the Government in each instance is asserting that "opinion" as a fact to be admitted or denied. For instance:

> First Louisiana was insolvent (*i.e.,* had negative regulatory capital) before the enactment of FIRREA on August 9, 1989, and continued to be insolvent at the time of its seizure on November 2, 1989, while including all its goodwill and excluding all of Union's operating losses.

CSUF at 50. Many of the other facts asserted by the Government similarly concern First Louisiana's financial state. The Plaintiff in each instance fails to offer evidence contrary to the assertion, but simply rests on the above-quoted response. In these instances, we take the Plaintiff's response as inadequate to create a factual dispute.

The Plaintiff also cites Mr. Brents' objection to the 1989 Report of Examination's net worth figures for First Louisiana alone, and for the merged institution. Based on Mr. Brents' objection, as stated within the Report of Examination, the Plaintiff objected to the Defendant's proposed finding that "by June 5, 1989, and possibly much earlier, First Louisiana's net worth had fallen below minimum requirements, even considering First Louisiana's interpretation of the forbearance letter." CSUF at 35. However, Mr. Brents does not specify how the examiner erred, nor does he offer his own net worth conclusions.

In a deposition held on June 28, 2000, Mr. Brents stated that he did not know if the disputes between the examiners and the bank regarding the forbearance amounts were of a "significant amount." *See* Deposition of Jerry W. Brents (Jun. 28, 2000) at 263–64. He also did not know how the disputes were resolved. The Plaintiff has failed to provide any calculations or other evidence that establish actual amounts in dispute, or that First Louisiana met its net worth requirements under Mr. Brents' interpretation of the forbearances. The Plaintiff did not offer any expert testimony or other evidence to dispute the calculations of the Defendant's expert, Mr. S. Thomas Cleveland, who concluded that First Louisiana failed capital requirements even while retaining all alleged contractual benefits. *See* Report of S. Thomas Cleveland (Dec. 7, 2001) at 6 ("First Louisiana, excluding Union Federal operating losses, had negative regulatory capital of ($630,000) at December 31, 1988 and ($3,504,000) at September 30, 1989.").

Thus for Rule 56 purposes, Mr. Brents' denial is only a general denial, and insufficient to create a dispute of fact. It is undisputed that losses attributed solely to First Louisiana disclosed a negative regulatory capital of approximately $460,000 according to the 1989 Report of Examination. *See* Report of Examination (Jun. 5, 1989) at 2. We also note that Mr. Brents and First Louisiana failed to challenge the regulators' calculation through administrative channels at the time, and thus are likely barred from raising them at this late date.

In the end, the Plaintiff may quibble with the precise net worth numbers related by the various sources. But there can be no doubt that as of mid–1989, First Louisiana was sustaining losses of ever-greater amounts,

that it was far below its required regulatory capital level, that it had in fact a negative net worth, and that this was true even giving full recognition to the forbearances granted in the Union merger. Contemporaneously, the regulators stated: "had the Union merger never occurred, [First Louisiana] would still be insolvent." *See* Report of Examination (Jun. 5, 1989) at 3.

### B. Date of the Government's Breach

*The Defendant's position is that, assuming arguendo it breached the contract, the date of the breach would be August 9, 1989, the date of FIRREA's enactment.*[**] *The Plaintiff agrees with the Defendant on the date of the breach.* In *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174 (1997), Judge Wiese held that the date of the Government's breach in *Winstar*-related cases for statute of limitations purposes was December 7, 1989, unless an earlier date could be proved in particular cases. *Id.* at 184. Judge Wiese noted that in deciding liability the Supreme Court left unanswered the question of the date of the Government's breach. *Id.; see also United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 2452–53, 135 L.Ed.2d 964 (1996).

This question was also addressed by the trial court in *Admiral III,* a *Winstar*-related case. *See Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418, 423–24 (2003) (*Admiral III*) (treating the date of enactment as the effective date of the Government's breach). Two prior decisions of this Court addressed the parties' claims in *Admiral III, Admiral Fin. Corp. v. United States,* 54 Fed. Cl. 247 (2002) and *Admiral Fin. Corp. v. United States,* 51 Fed.Cl. 366 (2002). Interestingly, the Court of Appeals for the Federal Circuit in affirming the trial court in *Admiral III* did not seem troubled at all by August 9 as a "drop dead date" for purposes of analysis. *Admiral Fin. Corp. v. United States,* 378 F.3d 1336, 1339 (Fed.Cir.2004) (acknowledging the trial court's ruling in *Admiral Fin. Corp. v. United States,* 54 Fed.Cl. 247 (2002), that the Government breached the contract with the enactment of FIR-

REA). This may well have been because so many of the determining events occurred before August 9, and because the post-August events merely played out circumstances that had been evident before that date. In this case, as well, the parlous state of First Louisiana was evident by mid year at the latest.

First Louisiana's insolvency was recognized in the June 1989 Report of Examination, and acknowledged by the Plaintiff in February 1989, if not earlier. *See* Capital Restoration Plan for First Louisiana Federal Savings Bank (Feb. 15, 1989); *see also* Report of Examination (Jun. 5, 1989). The regulators began to respond to this circumstance when they invoked the NWMA in July, followed by an unsuccessful effort to effect a voluntary seizure two weeks later. The bank was finally seized on November 1, 1989, for reasons that existed from early 1989, if not earlier, and which had nothing to do with the changes being wrought by the new statute.

### III. DAMAGES

As we have previously stated, the Plaintiff seeks three measures of damages: money-back restitution of its initial investment of $4 million, or perhaps $3 million; money-back restitution of its subsequent contribution of capital, the net-worth of FirstBanc and a cash contribution from FLHC of $500,000; and the "value of time" that the merger with the failing Union benefitted the Government. We treat these three claims in turn, finding them all legally deficient.

### A. Money Back Restitution

The Plaintiff's major damage claim seeks money-back restitution, the return of its initial investment of $4 million or, as the Government contends, $3 million. We reject this claim for four separate reasons: 1) the Government's breach was not material; 2) First Louisiana was not harmed by FIRREA; 3) recovery would constitute a windfall; and 4) if rescission-based damages represent a form

---

[**] In the Opinion filed on November 23, 2004, the Court misstated the Government's position as positing December 7, 1989, the date the regula-

tions were enacted, as the date of the breach. The Court regrets the error.

of expectancy or lost profits damages, no such entitlement has been established.

### 1. The Breach Was Not Material &
### 2. FIRREA Did Not Harm
#### First Louisiana

■ Even assuming there was a contract breach, the Plaintiff must still show that it suffered harm before it may collect damages. *See generally Admiral Fin. Corp.*, 378 F.3d at 1343, affirming *Admiral III*, 57 Fed.Cl. at 434–35. Moreover, as the Federal Circuit explained in *Hansen Bancorp.*, restitution damages are "available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." *Hansen Bancorp., Inc. v. United States,* 367 F.3d 1297, 1309 (Fed.Cir.2004) (citing Restatement (Second) of Contracts § 373 cmt. a (1981)). A total breach is one that "so substantially impairs the value of the contract to the injured party *at the time of the breach* that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Hansen Bancorp., Inc.,* 367 F.3d at 1311 (citing Restatement (Second) of Contracts § 243(4) (emphasis added)).

The Plaintiff argues that the Union-based forbearances were critical to it at the time the putative contract was formed, and that this Court should look no further. The Government counters that the Court should assess the value of those promises at the time of breach. By that time, the promises were worth nothing because First Louisiana was already insolvent, having a negative net worth even giving full effect to the Union promises. To determine whether there was a total breach, this Court must take into account the totality of events and circumstances surrounding the breach. *See Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992); *see also* Restatement (Second) of Contracts § 242 cmt. e (1981).

The Plaintiff's argument that this Court should look no further than the value of the forbearances at the time of contract formation rests upon a flawed reading of the Supreme Court's ruling in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (*Mobil Oil*). The plaintiff in *Mobil Oil* recouped the money it paid to the defendant for drilling rights that were never received under a damage theory of money back, rescission-based restitution. *Id.* at 607, 120 S.Ct. 2423. In that case the plaintiffs paid "up front cash" while the defendant never performed, allowing the Court to easily "unwind" the contract and award damages. *Mobil* reversed the Circuit Court opinion in *Marathon Oil Co. v. United States,* 177 F.3d 1331 (Fed.Cir.1999). That case held that the importance of a breach may be determined by post-breach events which had robbed the breached Government promise of any substance. The Plaintiff in this present matter appears to argue that under *Mobil Oil* a court may not examine the value of contract to the non-breaching party at the time of the breach. This position misreads the Court's opinion and runs counter to that of the Restatement and case law precedent.

In *Admiral III,* we held, in part, that Admiral's damage claim failed because the enactment of FIRREA was not the cause of the bank's demise. *See* 57 Fed.Cl. at 434. In so concluding we looked to the value of the contract to the bank at the time of the breach. Because Admiral was not harmed by FIRREA, restitution damages were inappropriate. The Federal Circuit affirmed our ruling on this point. *See Admiral Fin. Corp.,* 378 F.3d at 1343. The Plaintiff recognizes the Federal Circuit's ruling is contrary to its reading of *Mobil Oil,* but counters that "[t]his holding by the [Federal Circuit] in *Admiral* is contrary to the United States Supreme Court's decision in *Mobil Oil* as cited by the court in *Admiral*." Pl.'s Supp. Brief (Aug. 11, 2004) at 6. We find the Plaintiff's reasoning unpersuasive, not to say wholly irregular.

The Plaintiff attempts to distinguish the facts in the case at hand from those found in *Admiral,* based primarily on two arguments. First, there has not been a showing, based upon the undisputed facts, that First Louisiana failed to meet its minimum capital requirement when Union forbearances, including goodwill, were taken into consideration. Second, the enactment of FIRREA—and

perhaps even its introduction in bill form—had a negative effect on the Holding Company's ability to find the necessary outside funding for thrift.

As to the first attempted distinction, there can be no conclusion other than that the breached Union promises were worth nothing when FIRREA was enacted. At most, FIRREA constituted a technical breach, and we doubt even that. Both Admiral and First Louisiana experienced financial difficulties from early on. We have already rejected Plaintiff's attempt to dispute this fact. First Louisiana never had a profitable year after 1985, which was profitable only due to the sales of Union's best loans. We have discussed its other shortcomings, including insider dealings. A review of the facts relied upon in *Admiral III* illustrates just how similar the situation of the two institutions was at the time of FIRREA's enactment.

Soon after its creation, Admiral was "already running operational deficits." *Admiral III*, 57 Fed.Cl. at 434. Pre–FIRREA, in December 1988, Admiral received a MACRO rating of 4. *Id.* at 434–35. Admiral attempted to show that FIRREA had "drastically diminished its ability to maintain regulatory capital." *Id.* However, Admiral was already running at a capital deficit. We conceded that "FIRREA did not help matters" because post-FIRREA "a new acquirer would have to first make up for the goodwill, and then address the remaining capital deficiency—$22 million instead of $12 million." *Id.* at 435. "But even without FIRREA, it was still $12 million." *Id.* Based upon ample evidence we concluded that Admiral was failing under pre-FIRREA capital requirements due to factors that ultimately—and independently of FIRREA—led to its seizure. *Id.*

First Louisiana's financial situation prior to and at the enactment of FIRREA was similarly dire. In her March 13, 1989, Financial Summary First Louisiana's comptroller, Ms. Chalmers, concluded that "the Bank is RAP and GAAP insolvent, and there is no shareholder equity value." *See* Interoffice Memorandum from Sandi Chalmers to Board of Directors (Mar. 13, 1989) at 58. On June 5, 1989, in its Report of Examination, the FHLB of Dallas assigned First Louisiana a

MACRO rating of 5—a worse rating than that received by the bank in *Admiral*. *See* Report of Examination (Jun. 5, 1989) at 1. After giving full effect to the Union forbearances, the Report disclosed a negative regulatory capital of approximately $460,000. *Id.* at 2. The examiners concluded that "had the Union Federal merger never occurred, the institution would still be insolvent." *Id.* at 3. This was before the enactment of FIRREA.

It is thus clear that no matter how central the Union forbearances may have been at the time the contract was formed, a point stressed by the Plaintiff's counsel, at the time of the breach, these promises were irrelevant. First Louisiana was insolvent notwithstanding the promises. And not only was the breach not material, it was not even technical. Like the *Admiral* bank, FIRREA caused First Louisiana no harm at all either at enactment or a seizure. Indeed, First Louisiana was seized in November 1, 1989, slightly over a month before FIRREA's implementing regulations came into effect, on December 7.

The Plaintiff attempts to distinguish *Admiral* on the additional grounds that while the enactment of FIRREA did not harm Admiral it harmed First Louisiana by dissuading both a group of potential investors and the Holding Company from investing additional funds into First Louisiana. *See also Admiral Fin. Corp.*, 378 F.3d at 1345 (affirming the trial court's holding that the enactment of FIRREA had no practical effect on the thrift's ability to find the necessary additional funding). Two investors were purportedly willing to infuse $2 million each provided that the Government would be willing to provide additional assistance. *See* Affidavit of Daniel Menard (Dec. 17, 2003) at 1–4; *see also* Affidavit of Jerry W. Brents (Dec. 17, 2003) at 4–5. The Plaintiff claims that the Holding Company was willing to invest an additional $4 million, also provided the Government afforded assistance. *Id.*

Whatever else one might say about the chances of the Government's favorable response to these proposals, none was forthcoming. The FLHBB had decided to suspend any further consideration of assistance to failing thrifts pending Congressional ac-

tion on the President's legislative proposals for reform. *See* FHLBB Memo to Principal Supervisory Agents (Mar. 3, 1989). The Plaintiff thus blames the failure of its recapitalization plans on this pre-FIRREA policy. In support, it cites two affidavits. The first by Mr. Brents states: "[a]s a result of the government's decision not to provide assistance and the uncertainty associated with the proposed legislation that later became known as FIRREA, neither the investors nor the Holding Company were willing to invest in First Louisiana until the guidelines in FIRREA were determined." Affidavit of Jerry W. Brents (Dec. 17, 2003) at 5. His sentiments were echoed by Mr. Menard's Affidavit. *See* Affidavit of Daniel Menard (Dec. 17, 2003) at 1–4.

The Plaintiff's argument fails for several reasons. Mr. Menard's Affidavit named the two would-be investors, but no affidavits from those individuals were provided. This case strongly contrasts with the contemporaneous evidence offered in *Admiral III,* in which letters and internal memoranda evidenced both an attempt at seeking outside investors and the "terms and inducements" offered to those potential investors. 57 Fed. Cl. at 430–431. The second-hand contemporaneous evidence in this case indicates that all plans and discussions regarding potential investors were "put on hold" after President Bush's announcement of his proposal to solve the savings and loan crisis. The "harm," if any there was, predates FIRREA's enactment. In any event, the outside help was conditioned on substantial Government assistance, as evidenced in the three recapitalization scenarios. *See* First Louisiana Interoffice Memorandum from Jerry W. Brents to Clifford Eugene (May 18, 1989). Therefore, well before the enactment of FIRREA, discussions with any potential investors were halted.

### 3. Awarding Restitution Damages to the Plaintiff Would Result in a Windfall

█ The Federal Circuit has held that restitution damages should not be awarded if the award would result in a windfall to the non-breaching party. *See, e.g., Hansen Bancorp, Inc.,* 367 F.3d at 1315; *Admiral Fin. Corp.,* 378 F.3d at 1345; *see also Hi–Shear Technology Corp. v. United States,* 356 F.3d 1372, 1382 (Fed.Cir.2004) ("the recovery of damages must not serve as a windfall to the non-breaching party"). As a general principle, "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle Talman Bank v. United States,* 317 F.3d 1363, 1371 (Fed.Cir.2003), citing 3 E. Allen Farnsworth, FARNSWORTH ON CONTRACTS 193 (2d ed.1998). Because the evidence demonstrates that the Plaintiff had lost its entire investment even in the absence of a breach on the part of the Defendant, awarding restitution in these circumstances would result in a windfall and transform the Government into the insurer against First Louisiana's poor business decisions.

### 4. Restitution as a Form of Expectancy

In *Admiral,* the Court of Appeals for the Federal Circuit stated that rescission-based restitution was an alternative measure of damages when it proves difficult to measure expectation damages. *Admiral Fin. Corp.,* 378 F.3d at 1344, citing Restatement of Restitution and Unjust Enrichment § 38 cmt. a (Tentative Draft No. 3 2004) (" 'Restitution damages'... are closely analogous in function to 'reliance damages,' in that both offer what is ordinarily a second-best alternative to a party injured by breach who cannot prove damages measured by expectation."). In other words, instead of standing alone as a theory of contract damages, money-back restitution is a subset of expectancy or lost profits. It is to be employed when there has been a finding that expectancy damages are warranted but prove incapable of determination.

Adopting this understanding, Plaintiff would have to establish a right to lost profits before it could offer money-back damages as a computational fallback. *See also Admiral Fin. Corp.,* 378 F.3d at 1344 ("the trial court had ample evidence to conclude that Admiral's expectancy damages attributable to the government's breach were zero. It was not necessary for the trial court to use restitution as an alternative measure of damages, since expectancy was not in doubt."). In this

case, of course, no one has ever mentioned lost profits and First Louisiana in the same sentence.

### B.    Return of Subsequent Contributions

Initially, the Plaintiff claimed that its restitution damages should include not only the Holding Company's initial investment, but also later donations. It claimed—and the Government disputed—a cash donation of $500,000 in 1987 and the value of the mortgage servicing portfolio of FirstBanc, $1,969,000, which the Holding Company sold in 1986 to First Louisiana. The cash donation is reflected in a document dated April 27, 1987. First Louisiana Savings Bank General Ledger (Apr. 27, 1987). The Plaintiff may well have abandoned this claim by failing to raise it in its Cross Motion for Summary Judgment on damages and by failing to respond to the Government's Opposition arguments during briefing. Suffice it to say that the Court of Appeals for the Federal Circuit rejected recovery of voluntary subsequent contributions such as these. *See Landmark Land Co. v. United States,* 256 F.3d 1365, 1375–77 (Fed.Cir.2001); *see also Hansen Bancorp, Inc.,* 367 F.3d at 1306.

### C.    Benefit Conferred on Defendant

■ The Plaintiff's last damage theory seeks to recover based upon the value of the "benefit of time" that the contract conferred upon the Government. Because this remedy seeks to restore a benefit conferred by the non-breaching party to the breaching party, it may be characterized as a form of restitution damages. *See* Restatement (Second) of Contracts § 344(c). The Plaintiff is entitled to restitution only to the extent that it conferred a benefit on the Government in performing the contract. Restatement (Second) of Contracts § 370 (1981). This is a questionable premise given the eventual failure of the thrift.

The Plaintiff's expert, Bryan H. Jones, opined that the Government benefitted through Union's merger with First Louisiana by receiving additional time within which to deal with the failure of Union. *See generally* Report of Findings of Bryan H. Jones (Jul. 2, 2001). Mr. Jones quantified this "benefit" by calculating the amount of cash that the FSLIC would have had to contribute to Un-

ion in order for Union to be able to invest in 5–year U.S. Treasury instruments that would pay enough in interest payments to cover Union's annual losses. He assumed that Union's losses would continue to equal its 1984 annual loss. This calculation resulted in a "benefit" of $7,537,000.

Alternatively, he calculated the total amount of funds that the FSLIC would have had to contribute to Union to cover its losses from 1985 until FIRREA was enacted in 1989. This calculation included certain assumptions regarding Union's investment strategies; loan portfolio; management; foreclosure and liquidation; property plant and equipment investments; growth; management of its deposit base; and cost of funds. This calculation resulted in a "benefit" of $11,867,000. Mr. Jones did not subtract from either "benefit" calculation the actual amount expended by the Government after First Louisiana's failure.

This approach was based upon language from the Federal Circuit's decision in *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374 (Fed.Cir.2001) (*Glendale I*). In *Glendale I,* the court stated:

> Alternatively, rather than approve a merger, the Government had open to it the option of hiring new and better management to run Broward [,the failing thrift,] and make a go of it, just as Glendale[, the acquiring thrift,] itself did. In a very real sense, what the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of the time was more than zero, there is no proof of what in fact it was worth.

*Id.* at 1382. The court in *Glendale I* did not actually award damages based upon this theory. Moreover, it noted that had the thrift at issue failed, as did First Louisiana, the Government "would have had to step in at that time and assume the very losses that Glendale now claims were benefits the Government received." *Glendale I,* 239 F.3d at 1382.

The Federal Circuit in *Glendale I* made it clear that restitution is inappropriate where based upon speculative and indeterminate gains received by the breaching party: "[w]e do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld." *Id.* We reject the Plaintiff's damage theory on similar grounds. Not only is it "speculative and indeterminate," but it also fails to consider the actual amount expended by the Government in bailing out the failed thrift. The Plaintiff's expert, Mr. Jones, conceded that he was aware of no instance in which the FSLIC infused cash for a failing thrift to invest in U.S. Treasuries. Under either calculation, the Plaintiff's model assumes a logical and regulatory improbability.

Finally, the Plaintiff is unable to cite a single case in which damages were awarded based upon this theory. The Defendant has cited numerous cases in which courts have rejected other plaintiffs' attempts to measure the benefit of time/liquidation cost savings. *See Admiral III,* 57 Fed.Cl. at 424 (quoting *Glendale I,* 239 F.3d at 1382); *see also Southern California Fed'l Sav. & Loan Assoc. v. United States,* 57 Fed.Cl. 598, 627–28 (2003) (rejecting a restitution model purporting to measure the liquidation cost savings to the Government). We find the Plaintiff's arguments to the contrary unpersuasive.

## IV. CONCLUSION

Accordingly, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment on Damages. The Clerk shall enter judgment for the Defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**