**BAYSIDE FEDERAL SAVINGS & LOAN ASSOCIATION, et al., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–452C.**

United States Court of Federal Claims.

Dec. 2, 2004.

John H. Carney, Dallas, Texas, for plaintiffs.

William F. Ryan, Assistant Director and Marc S. Sacks, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director for defendant. Edward P. Sullivan and Colleen Conry, of counsel.

### *Opinion and Order*

SYPOLT, Judge.

Plaintiff, Equisource Capital Corporation ("ECC"), seeks damages for the Federal Home Loan Bank Board's ("FHLBB's" or

"Board's") breach caused by the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),[1] of an alleged implied-in-fact agreement to permit plaintiff to count towards the minimum capital requirements set by bank regulators the goodwill generated by its acquisition of Bayside Federal Savings and Loan Association ("Bayside").

Defendant has moved for summary judgment pursuant to United States Court of Federal Claims Rule ("RCFC") 56 on the grounds that the circumstances of the regulatory approval of Bayside's merger application reveal no agreement by the government to treat goodwill as regulatory capital, and, even if so, that plaintiff assumed the risk of regulatory change.

## BACKGROUND

### Winstar Litigation

This is one of more than 120 *Winstar*-related cases brought in this court by savings and loan banks, or thrifts, alleging that the government breached contracts permitting the use of supervisory goodwill to meet regulatory capital requirements. *See United States v. Winstar Corp.*, 518 U.S. 839, 843–858, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The history and circumstances of the thrift crisis of the 1980's, which led to Board encouragement and "supervision" of acquisitions by relatively healthier thrifts of failing banks, are discussed at great length in *Winstar, supra* at 843–858, 116 S.Ct. 2432.

Under generally accepted accounting principles ("GAAP"), the entity surviving a merger or acquisition may elect between the pooling method of accounting, in which the assets of the transacting parties are fully merged, or the purchase method of accounting, in which the purchasing company records the acquired business at the lower of the cost or market value of the underlying assets.

When their market value is lower than the purchase price, as was often the case in acquisitions of failing thrifts during the 1980's, the difference is recorded on the purchaser's balance sheet as goodwill that may be amortized for up to 40 years.

The FHLBB allowed a merged thrift to count goodwill created in a merger or acquisition supervised by the FHLBB ("supervisory goodwill") in calculating its compliance with regulatory minimum capital requirements. After the enactment of FIRREA, however, the thrifts's ability to use goodwill for such purposes was curtailed.

The Supreme Court in *Winstar*, affirming the decision of the United States Court of Appeals for the Federal Circuit,[2] held that, if the circumstances of the transaction warranted (this was assumed in *Winstar*), the government's "express agreement" allowing the use of goodwill as a capital asset for regulatory purposes in a supervised merger or acquisition, in exchange for the thrifts' agreement to consummate the merger or acquisition, could be found to constitute a contract and that the sovereign act defense did not apply. *See Winstar* at 897–98, 116 S.Ct. 2432. Thus, the government was held to bear the risk of regulatory change.

The Supreme Court did not find that there would be a contract in every case, but only if circumstances of the transaction " 'establishes an express agreement' " allowing the use of goodwill as a capital asset for regulatory purposes. *Id.* at 865–66; 116 S.Ct. 2432 (quoting *Winstar*, 64 F.3d at 1544).

### Relevant Facts

John H. Carney, James R. Fisher, and Jeff C. Noebel, three Dallas-based businessmen, operated a number of corporate entities, under the name "Equisource," which were controlled by a holding company, Equisource Realty Corporation ("Equisource").[3] Equi-

---

1. Pub.L. No. 101–73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. § 1464.

2. *Winstar v. United States*, 64 F.3d 1531 (Fed.Cir. 1995) (en banc).

3. Along with ECC, other Equisource companies included Equisource Securities Corporation, Equisource Financial Corporation, Equisource

Realty Management, and Equisource Residential, Inc. Plaintiff objects to the defendant's description that these companies were grouped under an "umbrella." All the Equisource companies, however, had the same three shareholders; and correspondence regarding the acquisition of Bayside between its owners and the FHLBB was on

source owned plaintiff ECC, the sole general partner in United States Savings Associates, Ltd. ("USSA"), a limited partnership formed to acquire, own, operate, and manage thrifts. Both entities were created in 1988.

Bayside, which was formed in 1985 by Joseph T. Lettelleir and Stephen M. Fetters, almost immediately thereafter began to incur operating losses that ultimately led to its insolvency. Due to these financial problems, and the government's interest in Bayside's ability to insure its depositors' saving accounts, the FHLBB and Bayside entered into a consent agreement on October 1, 1987. Under the consent agreement, Bayside, in exchange for the FHLBB's agreement not to initiate cease and desist proceedings against Bayside for failing to meet its regulatory capital requirements, authorized the government to seek a "plan of combination or reorganization."

By 1987, because the Texas real estate market had crashed and real estate was no longer an attractive or profitable investment, Equisource became interested in purchasing a savings and loan bank. On October 5, 1987, Messrs. Carney, Fisher, and Noebel wrote a letter to Mr. Fetters "to serve as a manifestation of [their] intent" to enter into an agreement to purchase Bayside. A stock purchase agreement was entered into on October 29, 1987.

To obtain regulatory approval for its proposed acquisition of Bayside, ECC and USSA submitted an application, and a business plan for Bayside, to the FHLBB. The application was amended twice before August 10, 1988, when the FHLBB notified ECC's counsel that the acquisition was conditionally approved.

Shortly before the closing, USSA, ECC, and the Federal Savings and Loan Insurance Corporation ("FSLIC") entered into a Regulatory Capital Maintenance/Dividend Agreement ("RCMA"). In exchange for the FSLIC's approval of the acquisition, the RCMA bound ECC and USSA to maintain Bayside's capital levels, and to make up any shortfall.

The RCMA includes a risk-shifting clause at section VI(D), which provides as follows:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this Agreement.

Pending before the court is defendant's motion for summary judgment, as well as its notices of supplemental authority, filed on October 7 and 19, 2004, notifying the court of the decisions in *Admiral Financial Corp. v. United States,* 378 F.3d 1336 (Fed.Cir.2004), and *Coast–to–Coast Financial Corp. v. United States,* 62 Fed.Cl. 469 (2004). On November 15, 2004, by leave of the court, plaintiff filed a response to these notices. ,

### DISCUSSION

Defendant argues, *inter alia,* that the facts surrounding the regulatory approval of plaintiff's acquisition of Bayside did not indicate the formation of a contract to allow the use of goodwill as regulatory capital because there were no discussions or negotiations regarding such use of goodwill. In the alternative, defendant argues that the RCMA risk-shifting clause allocated the risk of regulatory change, including that caused by FIRREA, to plaintiff.

Plaintiff argues that the documents related to the acquisition of Bayside, together with Mr. Fishers' affidavit appended to plaintiff's response to defendant's motion for summary judgment, constitute *prima facie* evidence of contract. Plaintiff also contends that the risk-shifting clause did not alter the government's obligation to permit Bayside to count goodwill as regulatory capital over a 25–year amortization period.

### Standard of Review

Summary judgment is proper when the record, viewed in the light most favorable to the nonmovant, reveals no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See*

---

both Equisource Realty Corporation and Equi-

source Financial Corporation letterhead.

*O'Connor v. United States,* 308 F.3d 1233, 1240 (Fed.Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). On summary judgment made pursuant to RCFC 56, the court does not weigh the evidence or determine the truth of the facts presented, deciding only whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

For purposes of deciding defendant's motion for summary judgment, the court assumes that the entire course of dealing between plaintiff and the government, including the RCMA, gave rise to contract for the use of supervisory goodwill as regulatory capital.

After assuming the existence of contract, the only issue remaining for the court to decide is which party assumed the risk of regulatory change.

### Allocation of Risk in the RCMA

The *Winstar* court observed that any ambiguity regarding which party bore the risk of regulatory change could have been "eliminated" had "clearer language" been used, citing the risk-shifting provision in *Guaranty Financial Servs., Inc. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir.1991). *Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432. The provision in *Guaranty* is identical to the risk-shifting provision in this case.

The very same risk-shifting clause used in the *Guaranty* transaction (also in the RCMA), was considered by the Federal Circuit in *Admiral,* one of the cases recently brought to the attention of the court. *See Admiral,* 378 F.3d at 1342.

The Federal Circuit in *Admiral* noted the *Guaranty* court's conclusion that the provision "altered the government's obligations with respect to regulatory capital and amortization issues and shifted to Guaranty the risk of FIRREA's regulatory change with respect to those issues." *Id.* at 1341. The court held that the risk-shifting clause "makes it clear

that [a thrift's] obligations may increase or decrease under successor regulations," *id.* at 1342, and that the Supreme Court determined both that the government could " 'reserve the right to change the capital requirements without any responsibility to the thrift,' " and that the clause used in *Guaranty* would have such an effect. *Id.* at 1343 (quoting *Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432). Following the precedent of *Guaranty* and *Winstar,* the Federal Circuit in *Admiral* reversed the trial court's conclusion that a breach of contract occurred, because Admiral, by the risk-shifting clause, had assumed the risk of regulatory change brought about by the enactment of FIRREA.[4]

Plaintiff argues that "significant" facts exist in this case that distinguish the *Admiral* decision. Plaintiff has not indicated, however, any facts that are relevant or material to the decision in *Admiral,* which held that the shifting of risk did not depend on the other circumstances of the transaction and that the clause is "explicit with respect to regulatory change" and " 'reserved the [government's] right to change the capital requirements without any responsibility to the acquiring thrift." ' *Admiral,* 378 F.3d at 1342–43 (quoting *Winstar,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432).

### CONCLUSION

Because Bayside's RCMA contains the identical clause that was held, in *Guaranty, Admiral,* and *Coast–to–Coast,* to shift the risk of regulatory change to the plaintiff, defendant's motion for summary judgment is GRANTED. The clerk shall enter judgment accordingly.

### JUDGMENT

Pursuant to the court's Opinion and Order, filed December 2, 2004, granting defendant's motion for summary judgment,

4. Shortly after *Admiral* was decided, Judge Bruggink reopened, after final judgment, a *Winstar*-related case involving the same risk-shifting clause. *See Coast–to–Coast,* 62 Fed.Cl. at 470. The *Coast–to–Coast* decision had relied in part on the trial court's decision in *Admiral.* Deciding

that its liability conclusion was "impossible to square" with the Federal Circuit's *Admiral* decision, the court vacated its prior decision and granted summary judgment to the government. *Id.* at 472–73.

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed.